## Harrison's Appeal.

1. The Orphans' Courts of this Commonwealth are not bound as a matter of right to award an issue of devisavit vel non to test the validity of a will whenever a dispute as to facts is alleged by a contestant and suggested on the record, and will only grant an issue when evidence has been taken from which it appears that there is a conflict of testimony and a substantial dispute upon material points.

2. A testator, eighty years of age, but possessed of mental and physical vigor, left the bulk of his estate to one daughter, whose husband was his confidential adviser, the scrivener of the will, and trustee and co-executor under it: *Held*, that, in the absence of any evidence showing undue influence, or that the testator had not full knowledge of his estate and its disposition, no presumption arose against the validity of the will. *Held*, further, that there were no facts which, if submitted to a jury, would justify a verdict against the validity of the will, and that, therefore, an issue of devisavit vel non to the Common Pleas to test such validity was properly refused. *Held*, further, that the evidence in this case discloses nothing to impeach the integrity or professional propriety of the attorney who drafted the will, but the reverse.

May 3rd and 4th 1882. Before SHARSWOOD, C. J., MERCUR, PAXSON, TRUNKEY and GREEN, JJ. GORDON and STERRETT, JJ., did not sit.

APPEAL from the Orphans' Court of *Union county:* Of January Term 1882, No. 100.

Appeal of Jane Harrison, from a decree of the said court, refusing an issue of *devisavit vel non* to test the validity of the will of William Cameron, deceased, and also from a decree in

the said cause, refusing to reopen the said decree, and permit the appellant to adduce additional evidence.

The material facts of the case were as follows :—

William Cameron died September 10th 1877, leaving a widow, Eleanor Cameron, two daughters, Mary M., wife of John B. Packer, and Jane, wife of Dr. Francis C. Harrison, and four grandchildren, viz.: Martha C. House, wife of William H. House, and Margaret Jones, wife of Oliver B. Jones, who were daughters of Elizabeth F. Green, a deceased daughter of decedent, and William J. P. Cameron, and Nellie M. Cameron, who·were minor children of William Cameron, Jr., a deceased son of decedent.

A writing, purporting to be the last will and testament of said William Cameron, and dated March 26 1875, was admitted to probate on September 20th 1877, by the Register of Wills for Union county. The subscribing witnesses were J. B. McLaughlin and David Reber. John B. Packer and Dr. Francis C. Harrison, testator's sons-in-law, were appointed executors. The will was in the handwriting of John B. Packer, whose wife was the chief beneficiary thereunder.

On July 16th 1878, Martha C. House and William H. House appealed from the decision of the register, admitting the will to probate, and prayed for an issue to try the validity of the will, averring that if said will were ever executed by said William Cameron, it was induced by fraud and undue influence; and on September 17th 1878, the appellants filed a further petition praying for an issue to the Common Pleas, and averring as the ground therefor certain alleged matters in dispute.

The court (ELWELL, P. J., sitting in the place of BUCHER, P. J., who was related to contestants) refused the issue, filing the following opinion, Nov. 8th 1878 :—

On appeals from the register to the register's court, while that court existed. the proceedings were regulated by the Act of March 15th, 1832, entitled " An Act relating to Registers and Registers' Courts." The transfer of the powers and jurisdiction of the register's court to the orphans' court by the new Constitution, did not affect any change in the law applicable to proceedings on appeal from the register.

It is, by the 40th section of the Act (Purd. Dig. 1256), made the duty of the register's court in any cause litigated before it, to take the testimony of the witnesses in writing, and make it part of the proceedings in the case ; upon which testimony, the supreme court on appeal, may affirm, reverse, alter, or modify the decree of the register's court. The 41st section provides for the case of controverted facts as follows, viz.: " Whenever a dispute upon a matter of fact arises before any register's court, the said court shall, at the request of either party, direct

a precept for an issue to the court of common pleas of the county for the trial thereof."

This section is imperative in its terms, and makes a request for an issue a matter of right in every case within its purview: Cozzen's Will, 11 Smith, 196; Graham's Appeal, 11 Smith, 43; De Haven's Appeal, 25 Smith, 337.

The important question with which we have now to deal is, When within the meaning of the statute may a dispute be said to arise? Is it whenever facts are alleged by the contestant and suggested upon the record; or is it when evidence has been given from which it appears that there is conflict in the testimony, and a substantial dispute upon material facts?

The intention of a statute may sometimes be arrived at by reference to the context, and by comparing the language of different sections: Dwarris on Statutes, 174. By the 13th section of the Act in question, the register is authorized to direct an issue when a person entering a caveat shall allege matter of fact touching the validity of a will. The 41st section, as we have seen, requires that a dispute in matter of fact shall have arisen before the court can be required to direct an issue.

Now, if nothing more was intended to be required by the latter section than a specification of facts alleged to be in the dispute, it is difficult to understand why the phraseology of the two sections is different. But if we consider that the register is not necessarily learned in the law, we may find satisfactory reason why he may send the case to court upon an allegation of facts. But the same course of reasoning does not apply to the court, and, therefore, the law requires that it must appear that a dispute has arisen before the case can be properly sent to a jury for trial. In Commonwealth v. Bunn, 21 Smith 412, it was said by THOMPSON, C. J., that "the register's court, with a judge learned in the law and with all the powers of a court, ought, in reason, unless expressly limited, to be allowed the discretion of a court in determining upon the necessity of employing auxiliary powers to determine upon ultimate results, especially when both delay and expense are sure to follow its exercise." The construction of the Act of 1832 was under consideration by the court soon after its passage. In 1845 an able and exhaustive opinion was delivered by Judge KING, sitting in the register's court in Philadelphia, in which the inquiry in regard to when a dispute may be said to arise, is fully answered. He says; "The dispute as to facts must arise when the cause is on hearing before the court;" that is the time when the court is to judge whether there are truly any facts in dispute. "What a party may choose to call a disputed fact may, if the court proceeds, never appear in proof, or may be immaterial to the question before the court." And again, he says: "If we

construe this law to mean that when on hearing any cause before the register's court, there actually arise disputed facts material to the very question invoked in the controversy, the court must award an issue at the request of either party for a trial by jury; we accord all the right given by the law to one party without doing injustice to the other:" Bradford's Estate, 1 Parsons' Eq. Cases, 157.

What is said by the learned judge, on page 158, in regard to an affidavit as to facts by the party requesting an issue, does not destroy the force of the reasoning upon the subject of other evidence than that of the allegation of the party being required.

In practice, the rule laid down in this case has not been at all times strictly adhered to by the courts; but at the present time it is considered by the courts in the city of Philadelphia, and, so far as I have been able to ascertain, by other judges of the state, as the correct interpretation of the statute.

The passages in Hood on Executors, page 383, relied upon by the counsel for the appellants, are not opposed to the doctrine in Bradford's Estate. The author does not attempt to construe the statute, nor does he refer to any authority. He merely states, what the statute declares, that when a dispute arises before the court, as to any matter of fact, the court is bound on request to direct an issue. But he gives us no light as to how it shall be made manifest that there are matters of fact in dispute.

It is not my purpose to review the numerous cases which have been decided by the supreme court and the subordinate courts within the last few years, which have a bearing, some more and some less, upon the subject under consideration.

In some of the cases it is held that the granting of an issue is within the discretion of the court, subject to correction by the supreme court. This position renders it necessary that the court shall, to some extent at least, make judicial inquiry into the facts. The discretion to be exercised in such a case must not be arbitrary or willful, but it must be based upon facts, the knowledge of which is judicially acquired.

In other cases, as in De Haven's Appeal, 25 Smith, 340, it is said an issue is of right when sufficient grounds are specified. But it was held in the same case that the decree of the court below will be sustained, unless the evidence is sufficient to establish the facts alleged in the request for an issue.

So that after all it would seem that the absolute right of the parties depends upon the strength of their evidence.

After evidence given, the court will permit specifications of facts to be filed *nunc pro tunc;* but will refuse an issue thereon, unless, in its judgment, a proper case is presented for an issue: Ellen De Benneville Shaw's Will, 1 Weekly Notes, 332. In

South's Estate, 2 Weekly Notes, 212 the precise question raised here was decided by the Orphans' Court of Philadelphia, specification of facts were filed, and an issue was requested. The court recognized the right to demand an issue, but held that it must be supported by evidence. To the same general effect are other cases. I have examined them all with care, but will not extend this opinion by reference to any other than Restine's Estate, 3 Weekly Notes, 27; Colgate's Estate, 5 Weekly Notes, 170; Baxter's Appeal, 1 Brewster, 451; De Puy's Estate, 1 Weekly Notes, 212; Foster's Appeal, 5 Weekly Notes, 414, per WALLER, P. J.

Any other course of practice than that indicated in Bradford's Will and South's estate, supra, would make of the orphans' court the mere medium of transferring the entire case to another tribunal before it had itself moved in the cause, and even at the moment when its own jurisdiction first attached. If this court has no power to judge whether there are in truth matters in dispute affecting the merits of the controversy, it has no duty to perform but to certify alleged facts to another court, to register the decision of that court when it is returned, and to enter a decree in accordance therewith.

Indeed, the contention of the appellants is to the effect that by a mere affidavit of their belief that certain facts exist, they have taken from the court, to which they have appealed for the redress of a wrong, all power to make even a preliminary inquiry into the grounds of their complaint. In order to sustain this position the limits to the power of the court ought, in my judgment, to be more pointedly prescribed than they are in the Act of 1832.

After careful consideration, aided by the light of the numerous cases cited upon the argument, and others, I have had no difficulty in reaching the conclusion that the court not only has the power, but is charged with the duty to ascertain, from evidence adduced by the parties, what material facts are in dispute and to confine the issue, if one be granted, to the trial of such facts.

To the suggestion that it may be burdensome to the parties to take evidence before an issue is directed it may be answered, that while this may be so in some cases, in others it will prevent delay and avoid unnecessary expense.

This is no more burdensome than the practice of the court of common pleas in all rules to show cause why an issue shall not be granted. It accords exactly with that of the courts of chancery, which is thus stated in a standard work on the subject: "It is generally in those cases only where there is contradictory evidence that the court grants an issue to try a controverted fact. A mere suggestion upon the record,

unsupported by evidence or in opposition to evidence on the other side, is not sufficient:" 2 Daniel's Ch. Prac. 1077.

As this case now stands before the court the request for an issue is refused, on the ground that it is premature and inadmissible.

Afterwards the court appointed an examiner in the cause, before whom voluminous evidence was taken.

That adduced by the contestants showed—

1. That the testator was an old man, having been 79 years and 5 months of age at the date of the will, and nearly 82 years old at the time of his death.

2. That the scrivener was the son-in-law of the testator; that the testator advised with him in relation to his business transactions and availed himself of his services, whenever in the conduct of his business he required his services, in the drafting or examination of legal papers, or otherwise.

3. That the wife of the scrivener of the will, a daughter of the testator, receives, after the death of the testator's widow, the larger portion of his estate.

4. That when the testator made his will, in 1867 (written for him by John B. Linn, Esq.), he intended to make his two daughters, Mrs. Packer and Mrs. Harrison, equal; while in the several subsequent wills, of 1869, 1873, and 1875 (all written for him by John B. Packer, Esq.), Mrs. Packer's share was increased, and Mrs. Harrison's diminished.

The testimony on the part of the proponents of the will was to the following effect:—

1. That at the time of the execution of the will William Cameron was, as he had been all his life, a man with a vigorous intellect, remarkable for strength of mind, clearness of judgment and force of will; that he was enjoying good health at the time, was attending to the bank, farms, and the general business of his estate, and that he continued to enjoy good health and attend actively to the interests of his estate until within a few weeks of his death, which was two years and a half after the will was written.

2. That the will was written as a consolidation of the will of 1873 and codicil thereto, by Mr. Packer, not of his own motion, but after solicitation from the testator, in person and by letter, and through his brother, General Cameron.

3. That after the will was written it was read to the testator and understood by him and left with him. That before signing he had ample opportunity to examine it. That in the presence of his wife he invited two disinterested witnesses to attest it at a time selected by himself. That the act of execution was in the testator's own house, out of the presence of any legatee or devisee, and in the presence only of the disinterested attesting

witnesses selected by himself, and who were in daily business intercourse with him. That the will was brought by him from the dining-room, where he and Mrs. Cameron were sitting, was signed very deliberately on the margin of each page and at the end ; duly attested and placed in Mr. Cameron's tin box in the bank vault at his request.

4. That after the will was executed, it remained with him for some time, and was examined more than a year after its date, and many of its important provisions discussed by the testator and his brother, General Cameron.

5. That the testator gave explanations, on different occasions and to different persons, of the provisions of his will and his reasons for making them, showing that they were the result of his own judgment, uninfluenced by Mr. Packer or anybody else, except in the single instance of the bequests to the grandchildren which were considerably increased instead of diminished at the suggestion of Mr. Packer and Gen. Cameron, and that the will assailed was in substantial accordance with three other wills and codicils executed by him during a period of six years previous thereto. That the testator stated to different persons, in substance, that it was through Mr. Packer's aid and ability that he had made a great deal of his money, and he thought it no more than right that he should give the bulk of his property to his Mr. Packer's) family, and that he had done so.

Upon the coming in of the report of the examiner, W. H. House and Martha C. House, his wife, and Mrs. Jane Harrison, who had by leave of court, on March 5th 1879, elected to become a party contestant, filed specifications of facts alleged by contestants and denied by proponents, set forth in the opinion of the court given below, and moved the court to direct a precept for an issue to the common pleas.

On March 10th 1880, the demand for an issue was refused and the appeal was dismissed, ELWELL, P. J., filing the following opinion :—

The will, in this case, was admitted to probate on the 20th September 1877 ; on the 16th day of July following this appeal was taken out by Martha C. House, a granddaughter of the testator, who requested an issue of fact to determine the validity of the will, which bears date 26th day of March 1875. All parties in interest were notified of these proceedings by citation, and were permitted, if they chose, to take part therein. Subsequently, Mrs. Jane C. Harrison, wife of Dr. F. C. Harrison, one of the executors named in the will, became, by her next friend, a party to the contest.

After a full hearing, the request for an issue was refused on the ground that it was not supported by evidence, and was premature and inadmissible.

[Harrison's Appeal.]

In the opinion then filed, the reasons for refusing the request are fully stated, and the several recent decisions of the courts, which hold that an issue ought not to be directed without evidence to support the request, are cited.

Since that refusal, the parties, proponents and contestants, have taken a large amount of testimony before an examiner appointed by the court.

On the hearing after the close of the evidence, the contestants renewed the request for an issue to the common pleas, alleging that the testator was induced to make the will in question by the undue influence of John B. Packer, his son-in-law, who drew the will, who was the confidential adviser of the testator, and whose wife, Mary M. Packer, a daughter of the testator, is made devisee of the bulk of the estate. Also, that the testator was not sufficiently informed of the contents of the will to know what disposition of his estate was actually made thereby. And further, that this was not the last will of the testator, even if duly executed and the contents fully understood by him.

The will in question was executed nearly two years and a half before the death of Mr. Cameron. He was at that time almost eighty years of age, but he still possessed his mental and physical faculties to a remarkable degree. There is no question or dispute in regard to his capacity to transact business. Down to the time of his last sickness, a few months before his death, which occurred on the 10th of September, 1877, he was considered by every one who knew him as a man of strong mind and will, able to comprehend and carry on business transactions equal to any man in Union county. He was early in life a wholesale merchant in Philadelphia, and afterward a contractor upon the public works of the state. He was at one time a justice of the peace, and at different times president of several banking institutions, and down to the time of his last sickness was a director of the Lewisburg Bank, and controlled its management. After executing the will in question, he continued to transact business as before. He purchased a valuable farm after that, and superintended large improvements upon it. In short, before he was confined to his bed by the disease which caused his death, he remained, as he had been during life, a man of strong mind and of good judgment. Although he was not what is generally considered an educated man, and might not therefore have understood technical phrases in use in legal documents generally, yet in regard to the terms used in wills, it is not open for a doubt that he had become familiar with them by frequent use.

The subject of disposing of his large estate by will, and the manner of doing so, received careful consideration from Mr.

4 Outerbridge—30

Cameron from time to time, and made him familiar with the modes of expression and terms proper to be used to carry out his intentions.

In 1858 he executed a will which was drawn for him by Governor Pollock. On April 19th 1867, he executed another will drawn by John B. Linn, Esq., and on July 20th 1867, a codicil thereto, made necessary by the fact that Mrs. Green (mother of one of contestants), his daughter, had died. Again on the 5th of October 1869, he executed another will which was fully read and comprehended by him, and contained substantially the same terms as are contained in the will in question. Again on the 19th day of June 1873, he executed still another will, to which a codicil was made on the 15th March 1875. Then on the 26th day of March 1875, the present will, certainly no more difficult to understand than previous wills, was duly executed. Knowing as he did, the contents of his wills, and possessed as he was of an unclouded mind and a vigorous intellect, it is idle to speculate as to whether he understood what disposition he was making of his estate. The changes which he made from time to time, as circumstances changed, clearly show that he gave to that subject the fullest consideration. In the several wills from 1867 down, he constituted John B. Packer, Esq., husband of his daughter Mary M., and Dr. F. C. Harrison, husband of his daughter Jane, executors.

The will in question was written by Mr. Packer, and, as he testifies, when called as a witness for the contestants, in pursuance of instructions from Mr. Cameron, that it was desired by Mr. Cameron to have his will of June 19th 1873, and the codicil thereto, and some few alterations which he suggested, embodied in a new will; that this will was drawn by him, at his office in Sunbury, and by him taken to Lewisburg, and handed to Mr. Cameron, who examined the portions in which he had directed the alterations to be made, and that then the whole instrument was read by him (Packer) to Mr. Cameron, and left with him. It was at that time without date.

On the morning of March 26, 1875, as appears by the testimony of Brown McLaughlin and David Reber, by request of Mr. Cameron, they became subscribing witnesses to this will. Mr. Reber was the cashier and McLaughlin was the clerk in the Lewisburg National Bank, which was in the same building with the house of Mr. Cameron, when the will was signed. The will being written on twenty-three pages, Mr. Cameron began to sign on the margin of the pages before Mr. Reber came in: he then finished signing, acknowledged each signature to be his, and desired them to witness it, which they did. It was then, at his request, put by Mr. McLaughlin in a tin box in the vault of the bank, where Mr. Cameron kept his papers, where

it remained until the summer of 1876, when it was handed by Mr. Cameron to Mr. Packer to be kept.

This is the last testamentary writing made by Mr. Cameron, of which there is any competent evidence.

After proof of the due execution of a will, declarations by the testator at a time so remote from that of the execution as not to constitute part of the *res gestæ*, are not admissible to affect the validity of the will: Waterman *v.* Whitney, 11 N. Y. 157; 1 Redfield on Wills 542; Stevens *v.* Vancleve, 4 Wash. C. C. 263; Jackson *v.* Kniffen, 2 Johnson 31; Hayes *v.* West, 37 Ind. 21, cited 4 U. S. Digest, new series, 715; Fox *v.* Fox, The Reporter, vol. 7, p. 155; Clark *v.* Morrison, 1 Casey 453.

A will can neither be made nor defeated by proofs of declarations of the testator while the act of 1833 remains in force. The testimony in regard to the declarations made by Mr. Cameron, during his last sickness, in regard to the provision made by his will for Mrs. Boley, and of two other bequests of eight thousand dollars each, not found in the will, is ruled out as wholly incompetent for the purpose for which it was given, or for any purpose.

In view of the undisputed facts that Mr. Packer, who was the son-in-law and confidential adviser of the testator, and whose wife, by the provisions of the will, receives a much larger portion of the estate than all the other devisees and legatees together, I have given to the great volume of evidence taken by the examiner, careful investigation and consideration, with the view of ascertaining whether there is any evidence which ought to be submitted to a jury, and which would justify the court in sustaining a verdict against the will, on the ground that undue influence had been brought to bear to induce the testator to make the will the way he did.

"Lawful influence, such as that arising from legitimate, family, and social relations, must be allowed to produce its natural results, even in influencing last wills. However great the influence thus generated may be, it has no taint of unlawfulness in it; and there can be no presumption of its actual unlawful exercise, merely from the facts that it is known to have existed, and that it has manifestly operated on the testator's mind as a reason for his testamentary dispositions. It is only when such influence is unduly exerted over the very act of devising, so as to prevent the will from being truly the act of the testator, that the law condemns it as a vicious element of the testamentary act." Per LOWRIE, C. J., Dean *v.* Negley, 5 Wright 317.

"The will of a man who has testamentary capacity, cannot be avoided merely because it is unaccountably contrary to the

common sense of the country. His will, if not contrary to law, stands for the law of the descent of his property, whether his reasons for it be good or bad, if indeed they be his own, uninfluenced by unlawful influence from others : " Id.

"The undue influence which will avoid a will, must be such is to destroy the free agency of the testator at the time the instrument is made ; it must be a present constraint operating on his mind at the time of making the testament." Eckert *v.* Flowry, 7 Wright 46. In the language of WOODWARD, J., in McMahon *v.* Ryan, 8 Harris 329, "it must be a present constraint operating on the mind of the testator in the very act of making the testament ": Thompson *v.* Kyner, 15 Smith 379 ; Mary Wood's Estate, 36 Leg. Int. 202 ; Brick *v.* Brick, 66 N. Y. 144 ; Aid Society *v.* Loveridge, 70 N. Y. 387. In the light of these well-established principles of the law, the facts of the case in hand must be examined. In the first place, then, we have the undisputed fact that the testator was not only of sound mind and memory, but that he was in point of intellect beyond the average of men ; then, beside the positive testimony of Mr. Packer, in regard to instructions of the testator, in accordance with which the will was drawn, we have the fact that the paper was left with the testator for a time before it was executed, giving him full opportunity to make . himself familiar with its contents. The subscribing witnesses did not hear the will read to the testator, yet if there were not direct evidence that he knew its contents, we must presume that he did. "We must," says LOWRIE, J., in Hoshauer *v.* Hoshauer, 2 Casey 406, "admit the presumptions that arise from the ordinary course of doing such business ; and one of them is, that a person signing any instrument, and asking persons to attest it, has taken care to understand its contents. His signing shows that he is giving expression to some purpose of his mind, and we must presume that he knows that the writing contains that expression. In executing wills and other instruments, the witnesses seldom hear them read, because it is desired to save them this trouble or not to make the transaction unnecessarily public."

We have in addition the still further and not unimportant fact, that more than five years before making the will in question, the testator had changed his mind in regard to making Mrs. Harrison a residuary legatee or devisee of one-half of his estate. By the will of 1867, she and Mrs. Packer were made equal in that respect ; but by the will of October 5, 1869, the entire residue, after the specific bequests and devises, was given to Mrs. Packer. This change was understood by the testator. According to the uncontradicted and unquestioned testimony of

Mr. Geddes, a subscribing witness, that will was read to, approved and signed by Mr. Cameron.

But it is contended that the will of 1873, the codicil to that will, and the will in question were the product of undue influence on the part of Mr. Packer. This contention is founded solely upon the fact that Mr. Cameron having unlimited confidence in the integrity, business capacity, and legal ability of his son-in-law, availed himself of his advice and services whenever, in the transaction of his business, he required such advice and services, whether in the drafting of legal papers or otherwise; and from the further fact that the will in question drawn by him, by its provisions, gives to his wife a large proportion of the estate. Upon these facts alone, and from the inference claimed to be legitimately drawn therefrom, the demand for an issue is based. Outside of these there is not a scintilla of evidence which tends to show that Mr. Packer ever uttered a word to Mr. Cameron in regard to how he ought to dispose of his property. It does not appear by the testimony of any witness that either he or his wife ever made Mr. Cameron or any other person a disparaging remark in regard to Mrs. Harrison, or either of the four grandchildren, calculated to excite prejudice in his mind against them or any of them. There appears nowhere in the testimony a single fact or circumstance from which fraud or misrepresentation, or any attempt at coercion, can be inferred. It does not appear that Mr. Packer was in anywise officious in procuring the making or alterations of the several testamentary writings; on the contrary, the letters of Mr. Cameron to him in July, 1867, in regard to a change in the will drawn by Mr. Linn, and those of May 10th 1873, and February 1875, are manifestly invitations to him to come and make in his will changes which he, Cameron, desired to have made therein.

On this branch of the case, then, it only remains to inquire whether the will is rendered invalid by the fact that the scrivener is himself a legatee in trust for others, and that his wife, the daughter of the testator, is a legatee of the larger portion of the estate.

It would be profitless, in this connection, to trace the law on this subject from the civil law down through the varying decisions of the courts to the present time. The rule in England at the present day is that when a person prepares a will with a legacy to himself, it is at most a suspicious circumstance of more or less weight according to the facts of each particular case, in some of no weight at all, varying according to the circumstances, such as the quantum of the legacy, and the proportion it bears to property disposed of, but in no case amounting to more than a circumstance of suspicion, demanding the vigilant

care and circumspection of the court investigating the case. If there is no proof beyond the fact that the will was drawn by the legatee, the suspicion in ordinary cases would be removed by the fact of execution with knowledge of, and assent to, the contents of the instrument: Barry *v.* Butlin, 1 Curt. (Eng.) 637; Durling *v.* Loveland, 2 Curt. (Eng.) 225.

In Griffith *v.* Diffenderfer, The Reporter, vol. vii. page 527, substantially the same view of the law is taken by the Maryland Court of Appeals, and in Cramer *v.* Crumbaugh, 3 Md. Rep. 491, it was held that the law conceded to a man of sound mind the right to dispose of his property in any manner he may deem proper, consistent with its policy, either by gift or devise, and it is no valid objection to a will that the testator has given his property to strangers to his blood, provided he had the required mental capacity, and was free from undue influence, and that the fact that the will was written by the executor named in it, who, with his son, were the chief objects of the testator's bounty, while sufficient to excite suspicion, did not render the will invalid, there being clear proof of mental capacity. In New York the law is the same as held by Baron Parke in Barry *v.* Butlin (supra), Coffin *v.* Coffin, 23 N. Y. 9.

In Wilson *v.* Moran, 3 Bradford (N. Y.) 172, the court says : "No case has gone so far as to overthrow a will duly executed, when it was shown that the party executing it was of sound mind, and clearly understood its contents, though it was drawn by the person taking the estate."

The view taken of the law in Leading Cases in Equity 1285, in Riddell *v.* Johnson's Exrs., 26 Grattan 162, and in Drake's Appeal, 45 Conn. Rep. 9, cited by the counsel for the contestants, does not apply to a case where capacity, knowledge of contents, and freedom from coercion are clearly shown by undisputed testimony.

In our own state, as before stated, the presumption is, that a testator who signs an instrument as his will, does so voluntarily, and with full knowledge of its contents: Frew *v.* Clarke, 30 Smith 170 ; Hoshauer *v.* Hoshauer, supra. The law as now held here, is summed up fully and clearly In re codicil of John L. Neill, 37 Leg. Int. 39, by HANNA, J. He says : "It is neither illegal nor contrary to public policy for a testator to bequeath all or a large portion of his estate to his legal or spiritual adviser, his attending physician, his scrivener whom he had employed for many years, his housekeeper, his copartner in business, or confidential friend and daily companion, as a mark of his appreciation of their personal character or gratitude for past valuable services, and such a bequest should be sustained, and the intention of the testator respected, in the absence of

suspicious circumstances savoring of fraud, imposition, or other improper influences, or evidence of the ignorance of the testator as to the consequences of his act or mental incapacity. Should it appear, however, that the testator was of comparatively weak mind, either through infirmity of age, produced by sickness or casualty, incapable of comprehending the nature and effect of a testamentary paper, and easily influenced by the suggestions of those about him, or should other suspicious circumstances be shown, either from the acts or declarations of the party occupying the confidential relation to the testator, then it would be incumbent upon him to rebut the presumption arising that the bequest to him had been procured by undue influence or other fraud. The onus would then be removed from the contestants to the proponents of the will: Boyd v. Boyd, 16 Smith 292. And the existence of the fiduciary relation does not annul the testamentary act in favor of the attorney by his client, but such fact calls for watchfulness, lest some improper influence may have been exercised."

In Frew v. Clarke (supra), it was said by Mr. Justice MERCUR, that Boyd v. Boyd is predicated of general evidence of power exercised over a testator of comparatively weak mind. In that case such power was exercised by a stranger who was the principal beneficiary under the will, having no claims from relationship or otherwise, and for such reasons it was held that the legatee who drew the will, and who, with his relatives, was made a beneficiary to a large extent, was required to negative by evidence a presumption of undue influence. No such reasons and no such evidence exist in this case. The testator was not of weak mind; there is no evidence, either general or particular, that any power was exercised at the time of making his will or before, by which his mind and judgment were even attempted to be coerced. His estate was not given to a stranger, but to his immediate relatives.

He gave to his wife in this, as in all previous wills, a life estate in all his property, real and personal; subject to that estate he gave to Mr. Packer, two farms charged with the payment of legacies of $10,000 each, to four grandchildren, whose parents were dead; to his son-in-law, Dr. Harrison, he gave two very valuable farms and two pieces of woodland; to his daughter, Mrs. Harrison, all his real estate in and about Lewisburg, one-half his Iowa lands, his silverware, one-half his household furniture, and all his Lewisburg National Bank stock; and to his daughter, Mrs. Packer, by specific and general devises, all the residue of his estate. It is this latter bequest that gives rise to this contest. If the estate had been divided into equal shares, it is probable Mrs. Packer's share would have been about a quarter of a million of dollars; as it is she will

receive nearly two or three times that much. It is contended that this unequal division of the property has deprived Mrs. Harrison and the four grandchildren of their natural rights, and is therefore powerful evidence that the testator had been in some way and by some person unduly influenced by a force or power which amounted to coercion, and destroyed the free agency of the testator. It is true that by the statutory law of descents and distribution equality is the rule. But it is equally true that the law gives to every man the right to dispose of his property by his own will and not by any prescribed rule. His children have no natural rights as against that will; where there are no other facts which tend to impeach a will except the disproportionate bequests, the courts have no right to submit to a jury whether the instrument should, or should not stand as the will of the testator.

Whether the testator considered that the bequest to Dr. and Mrs. Harrison, with their one child, was an equitable division between them and Mrs. Packer, with her five children, or whether he was influenced by a desire to keep together to a large extent the property which he had accumulated in an active business life of more than half a century; or whether one devisee had not become a greater favorite than another by manifestations of affection and venerating regard toward him, or whether he believed his grandson was likely to turn out badly, or he was not satisfied with the treatment by others of his grandchildren of their mother, while living, are questions not important to be considered in the disposition of this case. If there had been want of mental capacity or facts from which fraud might be presumed, it might be important to examine the reasons given for the different bequests, but in the absence of such facts, it is enough to know that such is the will of the testator. Its reasonableness or unreasonableness is none of our concern.

In considering whether there are disputed facts which should be submitted to a jury, I have not given weight to the testimony on the part of the executors, by which it appears that the testator, both before and after executing this will, had fully considered what disposition he would make of his property, and gave reasons why he would make or had made it as he did; nor have I given weight to the fact that the provisions of the will were not kept secret, but were known to members of the family in part at least, and that more than a year after its execution the testator exhibited it to his brother, and declined to enlarge the bequests to the grandchildren.

I have reached the conclusion that the evidence adduced by the contestants fails to establish any grounds for setting aside this will. In regard to the testimony of Mr. Packer, I deem it

proper to say a word; he was called by the contestants, and therefore his testimony must be taken to be true unless it has been disproved: Light's Appeal, 12 Harris 180. If his testimony was true, there is not the slightest ground for this contest. If this testimony should be stricken out, we would then have the fact that the will was written by Mr. Packer and left with Mr. Cameron with ample opportunity to ascertain whether it was in accordance with his intentions, before he executed it, and after that he did execute and retain it as his will. Mr. Packer's testimony makes the case a little stronger than it would be without it, but without it, the evidence, with the legal presumptions arising therefrom, leaves no ground for an inference of undue or illegal influence, or that there were introduced into the will any bequests which were not dictated by, or were not in accordance with, the wishes and intentions of the testator. No will would be safe, if, under the circumstances here detailed, it could be thrown at large before a jury in the hope that some feeling in favor of equality among the next of kin would influence them to set it aside.

Holding these views, after a careful investigation of the whole evidence, much of which is irrelevant to the real question before the court, I must refuse the request for an issue. The authorities before referred to are clear to the point that an issue ought not to be granted, when the evidence, if submitted to a jury, would not justify a verdict against the will: Wainwright's Appeal, 36 Leg. Int. 292. If my conclusion is right, it is better for the parties that it be announced " at this end of the line," than after an expensive trial before a jury; if it is wrong, I have the satisfaction to know that the error will be corrected by the court of last resort.

The parties having submitted their evidence, and having been fully heard, they cannot be permitted to take other evidence for the purpose of establishing that there are material matters in dispute, and as nothing has been shown which invalidates the will, the appeal must be dismissed.

Mrs. Harrison thereupon petitioned the court to reopen the case, and to appoint an examiner to take additional testimony in the nature of after-discovered evidence regarding the habitual use by decedent of narcotics and stimulants, by which his mind had become impaired. The court dismissed the petition, on the ground that it did not allege how or when new evidence had been obtained, nor specifically describe the evidence, nor aver that it could not have been discovered by due diligence before the hearing.

Mrs. Harrison thereupon took this appeal, March 8th 1881, assigning for error the refusal of the court to grant appellant an

issue devisavit vel non until testimony was taken before an examiner, the refusal of the court to grant such an issue after the coming in of the examiner's report, and the refusal to reopen the case and permit the appellant to take additional testimony.

*Charles S. Wolfe* (with whom was *Jeremiah S. Black*), for appellant.—The confidential relation of Mr. Packer to the testator, in connection with the fact that his wife receives the bulk of the testator's estate, and he himself is a legatee, gives rise to a presumption of law against the validity of the will, and casts the burden of proof not on the contestant but on the proponent. Upon the admitted facts, therefore, the issue should have been granted.

It is contended by the appellees that an issue will not be awarded, unless the court would be justified, under the evidence in upholding a verdict against the will : De Haven's Appeal, 25 Smith 337 ; Hyatt *v.* Johnston, 10 Norris 196.

Under this rule, if in this case the contestants have presented evidence sufficient to satisfy a jury, had the proponents offered no evidence, an issue should have been awarded. It is the province of the jury, not of the orphans' court, to settle a question raised by conflicting evidence, which question should be submitted to them. The evidence here was that the will was written by Packer, who was testator's confidential adviser, and whose wife was the chief beneficiary. It is argued that Boyd *v.* Boyd, 16 Smith 283 ; Cuthbertson's Appeal, 1 Out. 163, and Wilson's Appeal, 11 W. N. C. 333, were decided on the grounds, first, that the fact that the testator was of weak mind was a condition favorable to the exercise of undue influence ; and second, the bequest to a stranger showed that undue influence had in fact been exercised. Now in this case, first, instead of non-testamentary capacity, the confidential relation of Packer to the testator shows that he had dominion over the testator's volition ; and secondly, it is as unnatural, and affords as strong proof of undue influence, for a testator to make an inequitable division of his property among his children as to disinherit them all in favor of a stranger.

An analysis of the will and codicil drawn by Mr. Linn in 1867, and those drawn by Mr. Packer in 1869, 1873, and 1875, shows that the bequests to Mrs. Harrison were decreased, and those to Mrs. Packer were increased, by the later wills. This circumstance, in connection with the other facts, is strong evidence of the exercise of undue influence by Mr. Packer.

*Wayne Mac Veagh* and *Joshua W. Comly* (with them *S. P. Wolverton*), for appellees.—An issue will not be awarded unless the court would be justified under the testimony in upholding a verdict against the will ; and such a verdict could not be sus-

tained unless the facts submitted to the jury are shown, by evidence, to be disputed, material and substantial: Knight's Appeal, 7 Harris 493; Restine's Estate, 3 Weekly Notes 27; Meally's Estate, Ibid. 370; In re will of Ellen de Benneville Shaw, 1 Ibid. 332; Colegate's Estate, 35 Leg. Int. 90; Jane Hardy's Will, 34 Leg. Int. 248; Boyer's Estate, 36 Leg. Int. 292; De Puy's Estate, 1 Weekly Notes 212; Frowert's Estate, 2 Ibid. 588; McLean's Estate, 2 Ibid. 338; Elizabeth Hoge's Will, 2 Brewster's Reports 450; Mintzer v. Baker, 5 Philada. Rep. 455; Dean v. Negley, 5 Wright 317; Graham's Appeal; 11 P. F. Smith 43; Bradford's Will, 1 Parsons 157; Wikoff's Appeal, 3 Harris 281; Commonwealth v. Bunn, 21 P. F. Smith 412; Cozzen's Will, 11 Id. 196; Foster's Appeal, 6 Norris 67; Wickersham's Appeal, 25 P. F. Smith 334; De Haven's Appeal, 25 Ibid. 337; Wainwright's Appeal, 8 Norris 220; Ryder v. Wombwell, Law Reports, 4 Exchequer 38; Jewell v. Parr, 13 Common Bench; Toomey v. The London & Brighton Railway Co., 3 Com. B., N. S. 150; Wheelton v. Hardisty, 8 Ellis & Blackburn 262; Raby, exr. of Cell v. Cell, 4 Norris 80; Hyatt v. Johnston, 10 Norris 196.

There is no evidence of undue influence. The mere relationship of Mr. Packer does not give rise to any presumption of such influence.

The mere fact that the party who prepared the will is himself a legatee does not, standing alone, create any presumption whatever against the validity of the instrument, or call for any proof in the first instance on the part of the proponents beyond the ordinary proof of execution: Barry v. Butlin, 1 Curt. 637; 2 Moore P. C. 480; Boyd v. Boyd, 16 Smith 282; Frew v. Clarke, 30 Smith 170.

But instead of Mr. Packer being a beneficiary under the will, the property he receives is not equal in value to the charges upon it, and the vesting of the title in him was simply the method chosen by the testator to provide a permanent source of income for his grandchildren. As mere matter of pecuniary advantage, Mr. Packer loses by the will, instead of gaining by it.

Where the testamentary capacity is perfect, fraud or undue influence sufficient to destroy the testator's freedom of will, at the time of execution, must be shown: Cuthbertson's Appeal, 1 Out. 163.

In the cases relied on by the other side, and in Wilson's Appeal, 11 Weekly Notes, 333, there was mental incapacity of the testator, affording a complete contrast with the facts of the present case.

*Furman Sheppard*, in reply,—The Act of March 15th 1832, § 41, Purd. Dig. 1256, pl. 22, provides that " whenever a

dispute upon a matter of fact arises before any register's court, the said Court shall, at the request of either party, direct a precept for an issue to the Court of Common Pleas," &c.   That imperative, mandatory legislative language is more than one hundred years old.   Penn's charter specifically provided for the appointment by him of officers for the probate of wills " with what ' power soever and in such form as to the said William Penn or his heirs shall seem most convenient :" Duke of Yorke's Book of Laws, 83.   The Act of 1705 § 8, 1 Sm. L. 35, vested in the register-general the full power granted by Penn's charter to the proprietary.   The Act of June 7th 1712, Peter Miller's Laws, 50 ; see 1 Sm. L. 36 note *x*, directed the register-general to call to his assistance two or more judges of the Common Pleas to decide caveats and matters in controversy. The Constitution of 1776 established, and the Act of March 14th 1777, 1 Sm. L. 443, re-established a register's office, &c.

Then came the Act of February 28th 1780, McKean's Laws of Penna. 270, section 9 of which provided : " That if the said register, upon a dispute of facts arising before him, shall send an issue into the Court of Common Pleas of the county to try the said facts, which he shall do at the request of either party," &c.   This mandatory language, here first used was repeated in the subsequent Act of April 13th 1791 § 22, 3 Sm. L. 35 : " if the Registers' Court, upon a dispute of facts arising before them shall send an issue into the Court of Common Pleas of the county to try the said facts, which they shall do at the request of either party," &c.   And it was again substantially repeated in the Act of March 15th 1832 § 41, P. L. 146, with the modification that the element of discretion in the former Acts, suggested by the words, " if the Register's Court . . . shall send an issue," " &c., is wholly rejected, and the direction given that " whenever a dispute upon a matter of fact arises . . . the said court shall, at the request of either party, direct a precept for an issue," &c. This brings to view the full force of the explanatory language of the revisers, Parke & Johns. Dig. 864, that where the controversy relates to extrinsic facts, such as the capacity or incapacity of the supposed testator, the court is required to send, at the request of a party, an issue into the Court of Common Pleas for the trial of the facts in dispute.

The duty of the Register's Court, or the Orphans' Court (which under the Constitution of 1874 takes the place of the Register's Court) to direct an issue on request of a party alleging a dispute of fact is ministerial, obligatory and not discretionary. In this case the filing of the petition averring such dispute and setting forth the grounds thereof gave the petitioner the constitutional right to an issue.   Yet the court held that such right depended on the court's view of the measure and weight

[Harrison's Appeal.]

of preliminary evidence to be taken before an examiner.  In so holding, the court followed a number of recent rulings in the lower courts, never approved by this court, which I contend are legal heresies.  The old Orphans' Court and Register's Court of this county held as this court had held, in De Haven's Appeal, 25 P. F. Smith 337, that an issue was of right.  In Restein's Estate, 3 W. N. C. 27, the present Orphans' Court of Philadelphia departed from the settled practice, and that Court has since multiplied its decisions in accordance with Restein's Estate, which have been followed in other counties, until it is assumed to be law.  While this court has decided the cases, as they have been presented to it where the parties have taken testimony and brought it up, it has never affirmed the doctrine that parties may be forced to take preliminary testimony, on which the Orphans' Court may or may not in their discretion award an issue.  This is equivalent, where the issue is granted, to two trials of a disputed fact, one in the Orphans' Court and one in the Common Pleas.

There are two classes of acts providing for feigned issues, which are in pari materia with the act of March 15th 1832, one class containing mandatory words directing an issue, the other, making it discretionary, viz., (1) Act of 16th April 1827 § 4; 9 Sm. Laws, 441, Purd. Dig. 615 : " The court shall, if the facts in dispute require it, direct an issue to be formed between the parties," (2) Act of June 16th 1836, § 87 P. L. 777, Purd. Dig. 656 : " If any fact connected with such distribution shall be in dispute, the court shall, at the request in writing of any party interested, direct an issue to try the same." (3) Act of April 20th 1846, § 2, P. L. 411, Purd. Dig. 655 : " If the right of the purchaser . . . shall be questioned or disputed, the court shall thereupon appoint an auditor . . or direct an issue." (4) Act of April 14th 1851, § 4, P. L. 612, Purd. Dig. 825 : " It may be lawful for the court in its discretion to refer the same . . . To an auditor, or it may direct an issue. "

The distinction was clearly in the mind of the Legislature and should be regarded by the courts.

The opinion of the court was delivered May 15th 1882.

PER CURIAM.—We affirm this decree upon the able opinions of Judge ELWELL, which we adopt as the opinion of this court. We think it proper to add, that there is not in the evidence anything whatever to impeach the character of the gentleman by whom the will was drafted for integrity or professional propriety.  Indeed, his conduct throughout was characterized by the nicest sense of honor.

Decree affirmed, and appeal dismissed at the cost of the appellant.