# A. J. HERSTER ET AL. v. W. H. HERSTER ET AL.

ERROR TO THE COURT OF COMMON PLEAS OF NORTHAMPTON
COUNTY.

Argued March 6, 1888—Decided January 7, 1889.

| | |
|---|---|
| 122 | 239 |
| 162 | 509 |
| 122 | 239 |
| 181 | 215 |
| 122 | 239 |
| 190 | 120 |
| 122 | 239 |
| 195 | 283 |
| 122 | 239 |
| e207 | 288 |
| 122 | 239 |
| 210 | 602 |
| 211 | 471 |

1. Undue influence exists wherever through weakness, ignorance, dependence, or implicit reliance of one on the good faith of another, the latter obtains an ascendency which prevents the former from exercising an unbiased judgment, and, to affect a will it must, in a measure at least, destroy free agency, and must operate on the mind of the testator at the time of making the will.

2. Because a person of feeble intellect is much more easily influenced by undue means than is one of a vigorous mind, it follows, that in passing upon a question of undue influence, the strength and condition of the testator's mind may become a proper, indeed, an essential subject of inquiry.

3. In an issue raised upon the question of fraud and undue influence alone, though a testator's declarations cannot have any force whatever in establishing the facts of fraud or undue influence, yet if they are reasonably connected in point of time with the testamentary act, they are admissible as tending to show the state and condition of the testator's mind.

4. In order that declarations of the testator that are not made at the very time of the execution of the will, may be considered at all upon an issue of undue influence, there must be proof of other facts and circumstances indicating circumvention or fraud in the procurement of the will, for such declarations are received, not as proof of the fact, but to show that there are grounds for apprehending and opportunities for exercising undue influence.

5. Declarations made before and after the testamentary act have some significance in showing inferentially the mental condition at the time of it, hence the limitations which govern the admission of such evidence must depend largely on the character of the unsoundness attempted to be proved, and some latitude of proof must be allowed, subject to the judgment of the court in each particular case.

6. As the object of making a will is to disturb the equality of distribution established by the law, it is only when a will is grossly unreasonable, in its provisions, and plainly inconsistent with the testator's duty to his family, that, in a case of doubt, inequality of disposition can have any effect upon the question of undue influence.

7. In an issue devisavit vel non, the question of mental incapacity, or of undue influence, should not be submitted to the jury where the evidence is of such unsatisfactory character that the court would not sustain a

Statement of Facts.

verdict upon it, and such submission upon such evidence is ground for reversal here.

8. Where there is some evidence of mental impairment, yet with it there is overwhelming testimony that, notwithstanding this impairment, the testator retained a business capacity rarely found with his age, evidence of his declarations, trivial and inconsequent in their character, are insufficient to establish the operation of undue influence, especially when they were made several years after the will was executed.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY, J., absent.

No. 159 January Term 1888, Sup. Ct.; court below, No. 92 February Term 1885, C. P.

On October 19, 1887, the remittitur in Herster v. Herster, 116 Pa. 612, was filed in the court below, showing the reversal of the judgment with a venire de novo.

At the second trial of the cause, on November 21, 1887, the parties and the pleadings remained the same. The contestants, to wit, William Henry Herster and Irwin Reich and Eliza Reich, his wife, in right of said Eliza Reich, were the plaintiffs in the issue, and Andrew Jackson Herster, devisee, and Andrew Jackson Herster and James W. Lynn, executors of the will of Andrew Herster, deceased, were the defendants.

The testator had died on May 27, 1882, leaving a will dated June 13, 1874, with two codicils thereto, one dated August 29, 1878, and the other May 7, 1880. The pleadings raised an issue of fact upon each testamentary paper, whether the will and the codicils or either of them, had been procured to be executed by fraud and undue influence exercised by or on behalf of Andrew Jackson Herster. The nature of the case presented by the plaintiffs is indicated in the Statement of Facts with the report of Herster v. Herster, 116 Pa. 612, and the character of the testimony adduced by the plaintiffs is shown in the Opinion of the Court, in this case.

The plaintiffs called Amandus Frey.

Q. State whether you had any transaction with him (the testator) in reference to a sale of your lot to him? A. I had.
Q. State when it was and what took place? A. It was in the latter part of 1880, or in the beginning of 1881, I could not positively say.

Defendants' counsel: This transaction and conversation with

the testator is objected to, so far as it affects or tends to affect the execution of the will and the first codicil to the will.

Plaintiffs' counsel: We propose to connect Jackson with the offer.

By the court: The objection is overruled; exception.[2]

The testimony of the witness appears in the Opinion of the Court.

Charles Halbing, called by plaintiffs:

Plaintiffs proposed to prove that during the time the witness lived with testator, in 1880 or 1881, on frequent occasions Jackson made remarks to the father, or in the presence of the father, derogatory to the character and habits of life of all his other children and of their children.

Objected to, so far as it relates to any question of undue influence exercised over the mind of the testator in the testamentary act of making the will of 1874, and as illustrating any present restraint on the mind of the testator in making the codicil of 1878.

By the court: The objection is overruled; exception.[7]

The testimony of the witness appears in the Opinion of the Court.

Jacob Herster, called by plaintiffs:

Plaintiffs now propose to prove by this witness that two weeks before the death of Andrew Herster and the day before he had the last stroke of apoplexy which produced his death, the witness went to visit his father, and his father told him that Mr. Lynn had two papers of his in his possession, which he wanted to get, and that he had sent Jack to Lynn to get them a number of times, and that Jack always came back and said he either could not find Lynn or that Lynn would bring the papers out himself, and that the papers were all wrong, and that he must have them before he died; that he said that he had that afternoon, just before the witness came in, sent his son Jackson to find Mr. Lynn and to get these two papers, and that he wanted the witness to wait until Jackson came back, and that if Jackson did not bring these two papers, then the witness must go and find Mr. Lynn and get the papers from him, because those papers were all wrong, and he must have them before he died; and that the witness waited until about 10 o'clock of that evening and Jackson did not return, and,

being obliged then to go home, his father made him promise
that on the Monday morning following he would go to Lynn's
office not later than 8 o'clock and get these papers, and that
he must have them, and he must be sure to bring them be-
cause they were all wrong and he must have them before he
died; and that the next morning the witness was suddenly
summoned by a messenger on horseback to come in, that his
father was dying, and that he came in, and that his father then
had a stroke of apoplexy, and was unconscious for a consid-
erable portion of time, for the next thirteen days, but at times
seemed to regain consciousness, and that he repeatedly ex-
claimed, while lying on his death-bed, " Mein Gott in Himmel,
es is alles letz, es is alles letz," and then after a time he would
say in English, " My God, it is all wrong, it is all wrong;
what shall I do ! " and that on Saturday two weeks [before]
that he had requested the witness to go and get these papers,
and that during this while the old gentleman was exclaiming,
" Mein Gott, es is alles letz," the witness thought he wanted
to see his son Jackson, and that he went to Jackson, or sent
to Jackson, and tried to get him repeatedly to come into the
room, but that Jackson would not come into the room while
he was there.

Objected to by defendants, because it tends only to prove
an unexecuted purpose of revocation or an attempt to prove a
parol revocation, incompetent and irrelevant under the act of
assembly, requiring revocations of wills and testaments to be
in writing; and because the evidence of declarations of the
testator made eight years after the execution of the will and
four years after the execution of the first codicil, and two
years after the execution of the second codicil, and therefore
incompetent as evidence of undue influence, or as indicating
a present restraint operating upon the mind of the testator in
any of the testamentary acts.

By the court: Objection overruled; exception.[11]

The testimony of the witness given under this offer is re-
ferred to in the Opinion of the Court.

Under various other and like offers by the plaintiffs, admit-
ted under exception to the defendants, and assigned as error,
testimony was introduced in proof of declarations of the tes-
tator made at different periods of time after the execution of
the will or of the several codicils.

Charge of Court below.

After general instructions upon the subject of undue influence affecting a testamentary disposition, the court, SCHUYLER, P. J., charged the jury:

Enough has now been said, perhaps, to enable you to understand what is meant by that undue influence which is sufficient to avoid a will. The next point to which I call your attention is that undue influence will not be presumed. It must be proved. I do not mean that it must be proved by direct and positive testimony, for that would scarcely ever be possible; but it must be established by affirmative evidence of facts, from which, if satisfactorily proved, undue influence results as an unavoidable inference. You are not at liberty to infer that the will and codicils in controversy were procured by undue influence, from the mere fact, if it be a fact, that Jackson had the confidence of his father, the testator, and that the testator deferred to him in matters of business, even though it be accompanied by the additional fact that under the will and codicils, Jackson takes almost the entire estate, to the exclusion of his brothers and sisters. It is not unlawful, nor is it uncommon, for parents to have favorites even among their own children, nor is the selection of favorites always wisely made. But when the relation is established, it must, as we have seen, be allowed to produce its natural results. [If one of these results should be the entire disherison of all of a testator's children, except the lucky favorite or favorites, it must be submitted to, no matter how much it may shock our sense of propriety, provided the testator was of a sound and disposing mind, and provided he was not unduly influenced to make his will in that way.] [19]

Upon this subject our Supreme Court has spoken in language that cannot be mistaken. Thus, in Dean v. Negley, 41 Pa. 316, LOWRIE, C. J., says: " The will of a man who has testamentary capacity cannot be avoided, merely, because it is unaccountably contrary to the common sense of the country. His will, if not contrary to law, stands for the law of descent of *his* property, whether his reasons for it be good or bad, if, indeed, they be his own, uninduced by unlawful influence from others." Even more emphatic is the language of PAXSON, J., in Cauffman v. Long, 82 Pa. 77. . . . . .

Nor are you at liberty to infer undue influence from the

fact, if you should find it to be a fact, that old Mr. Herster at the time the will and codicils were made was a man of weak mind. "Undoubtedly, if the mind of the testator was weak, it would require less influence to control his will than it would have required to control the will of one whose mind was in full vigor. But neither moral nor physical constraint is to be inferred from mental weakness alone. That undue influence, which suffices to destroy an alleged will, is distinct from weakness and has no necessary connection with it:" Eckert v. Flowry, supra. If, therefore, there were nothing more before you than the alleged fact that old Mr. Herster's mind was weak, and the alleged fact that he confided in and deferred to Jackson, supposing these facts to be proved to your entire satisfaction, coupled with the additional admitted fact that the will and codicils give to Jackson almost the whole of the testator's property, it would be your duty to return a verdict in favor of the defendants; but these circumstances are legitimately before you, and you are to give to them, in connection with the other evidence, such weight as you think them entitled to.

I have said that the question for your decision is, whether the will and codicils were procured by undue influence. That is the only question for your decision. You may have fallen into the idea, from the great mass of evidence in that direction, that the issue being tried before you is whether old Mr. Herster had sufficient mind to make a will. That question is not before you at all, for the plaintiffs admit that the testator, in the absence of undue influence, was entirely competent to make a will. The only purpose of the evidence, introduced by the plaintiffs as to the condition of the testator's mind, is to show that his mind had become so weakened by disease and old age as to make the testator an easy prey to the alleged machinations of Jackson and Jackson's wife, to have the will and codicils made as they were made. Have the plaintiffs satisfied you that Jackson and his wife, or Jackson alone, was engaged in such a scheme as that, and were the will and codicils the result?

In this connection it is proper that I should remind you that although in form you have been sworn to try but a single issue, you have in fact been trying three issues, the first being whether

or not the will was obtained by undue .influence, the second being whether the first codicil was thus obtained, and the third being whether the second codicil was thus obtained. These are separate and distinct issues, and should be passed upon by you separately.   It is important that you should bear this in mind for the following reasons : . . . . .

One word more.   During the progress of this trial you have had everything to remind you that the case on trial is one of unusual importance.   It has been many years since a cause has been tried in this court involving so large a stake, and each one of you should feel honored to be intrusted with the decision of issues so vital to all the parties in interest.   In proportion to the importance of the case is your responsibility.   You should not allow your private opinions or your private feelings to have any voice in your deliberations.   Some of you may think that a paper purporting to be a last will and testament, is of so sacred a character that it ought not to be set aside, except upon evidence so overwhelming as to admit of no possibility of doubt, either that the will was signed by a person of unsound mind, or that it was procured to be executed by either fraud or undue influence.   [Some of you may be possessed by a feeling of indignation at the inequalities in the will and codicils],[20] or by a feeling of sympathy for one or another of the parties to be affected by your verdict.   I deem it to be my duty to say to you that if any of you entertain such thoughts or feelings, you should discard them utterly. If any one of you should be unable to do this, that fact would simply demonstrate the unfitness of such juror to be a juror in any case, much less in a case of the magnitude and importance of the present one.

[I cannot better conclude my general charge than by citing the language of the Supreme Court in this very case, as follows : "It is, perhaps, well to say that undue influence may be exercised secretly as well as openly, and this is especially possible when a confidential relation exists between the principal devisee and the testator, and they dwell together in the same house.   In such cases it is not easy to make out an allegation of undue influence by proof which is direct and positive, nor is it necessary to do so.   The effects of its exertion may be very visible, but as these may also be consistent with

Charge of Court below.

a perfectly free will, much caution must be exercised by the jury in considering such an aspect of the case. Rash conclusions must not be drawn simply because of a large disproportion of the estate being given to one to the exclusion of the others, and the evidence of the exertion of undue influence must be of a satisfactory and convincing character whether it be direct or circumstantial."] [21]

The defendants' points [inter alia], are answered:

4. The evidence in the case cannot be considered by the jury, because it does not rise to the standard which would move the court, as chancellor, to decree the cancellation of the will and codicils on the ground of fraud.

Answer: I cannot affirm this point. [26]

5. The jury must disregard all testimony, in the cause, of declarations made by the testator after the execution of the will of June 13, 1874, of communications made by A. J. Herster and his wife relative to his son Jacob or his daughter Eliza Reich, as indicating any influence upon the testator in reference to their shares, as no change is made in respect to them in either codicil.

Answer: I cannot affirm this point. [27]

6. The jury must disregard all testimony of declarations of decedent concerning information imparted or influence exerted by A. J. Herster or his wife, after the execution of the will or codicils respectively and not closely connected in point of time with the execution of the same, as not showing a present constraint operating upon the mind of the testator in the testamentary acts.

Answer: I cannot affirm this point. [28]

The verdict of the jury was in favor of the plaintiffs. Judgment having been entered, the defendants took this writ assigning as error, inter alia:

2, 7. The admission of plaintiffs' offers. [2] [7]

11. The admission of plaintiffs' offer. [11]

19–21. The parts of the charge embraced in [ ] [19 to 21]

26–28. The answers to the defendants' points. [26 to 28]

*Mr. O. H. Meyers* and *Mr. Henry W. Scott* (with them *Mr. Wm. Mutchler*), for the plaintiffs in error:

The case of the plaintiffs below is one solely of declarations of the testator. They are not declarations of existing facts, but only that certain other declarations were made to him; made by one who is not the sole devisee, and testified to only by those who are interested in setting the will aside. The declarations of the testator were made at times either remote from the testamentary acts, or introduced generally, without limitation as to time. But when the declarations were made *to* the testator, of which *his* unsworn declarations are sought to be made the proof, and which were the exercise of the influence alleged, there is not a syllable of proof. Most of the facts asserted in the declarations of testator are proven to be true; but, assuming them all to be false, the principal devisee and his wife deny under oath the communication to him. Such parol evidence is insufficient to submit to a jury to impeach a will.

1. Undue influence is the very question of fraud. It is so under the pleadings in this case. To justify its submission to the jury, the proof must rise to the standard which would move a chancellor to decree the cancellation of a deed. It must be " clear, precise and indubitable," and must be " not only consistent with the hypothesis of the will having been obtained by undue influences, but it must be inconsistent with any other hypothesis:" Williams on Exrs., *70–72; Rowand v. Finney, 96 Pa. 192; Bank v. Smith, 99 Mass. 611; Cotton v. Wood, 8 C. B., N. S., 572; Thomas v. Loose, 114 Pa. 46; Clingan v. Mitcheltree, 31 Pa. 25, 36.

2. Even if the declarations were competent evidence as they were admitted in the current progress of the trial, they ought not to have been submitted to the jury, under our prayers for instructions, because not connected with the purposes of the testator in his testamentary acts. They must be proper evidence of a present operating restraint upon him in making his will and codicils: Wainwright's App., 89 Pa. 220; Eckert v. Flowry, 43 Pa. 52; Cauffman v. Long, 82 Pa. 72; Wilson v. Mitchell, 101 Pa. 495; Thompson v. Kyner, 65 Pa. 368. Influences long past and gone and in no way shown to be connected with the testamentary act, are not evidence to impeach a will: McMahon v. Ryan, 20 Pa. 331; Wainwright's App., 89 Pa. 220.

3. There is authority for the proposition, that on the subject of mental capacity, declarations of the testator are proper for the consideration of the jury, as evidence of his condition of mind, but that question is not in issue under the pleadings. And if there was sufficient independent evidence of undue influence, the court might direct the jury to the evidence of declarations to ascertain the testator's state of mind, with reference to its susceptibility to influence ; but when there is no *other* evidence of undue influence, the court must withdraw it from the consideration of the jury : Redf. on Wills, 4th ed., 547* ; Comstock v. Hadlyme Ec. Soc., 8 Conn. 254 (20 Amer. D. 100) ; Kinne v. Kinne, 9 Conn. 102 (21 Amer. D. 732). " It is certain such testimony is not admissible for the purpose of proving any distinct fact, depending on the force of the admission, since the testator is not a party to the question of validity of his will : " Redf. on Wills, 2d ed., 473, § 39 ; Moritz v. Brough, 16 S. & R. 404 : Rambler v. Tryon, 7 S. & R. 92 ; Chess v. Chess, 1 P. & W. 32 ; Hoshauer v. Hoshauer, 26 Pa. 404 ; Tawney v. Long, 76 Pa. 106 ; McTaggart v. Thompson, 14 Pa. 149 ; Thompson v. Kyner, 65 Pa. 368 ; Harrison's App., 100 Pa. 458 ; Clark v. Morrison, 25 Pa. 453 ; Linton's App., 104 Pa. 228 ; Stevens v. Vancleve, 4 Wash. C. C. 265 ; Trost v. Dingler, 118 Pa. 259 ; Jackson v. Kniffen, 2 Johns. 31 ; Provis v. Reed, 5 Bing. 435. The central thought of the excluding principle in all the cases, and especially so in Pennsylvania, is that such declarations tend to a parol revocation of the will, which is void under the act of 1833.

4. Moreover, the interests of legatees and devisees under a will are not joint, but several ; and hence the declarations of one cannot be given in evidence to · affect or prejudice the others : Boyd v. Eby, 8 W. 66 ; Clingan v. Mitcheltree, 31 Pa. 25 ; Clark v. Morrison, 25 Pa. 453. Now, if the persons interested in the cancellation of this will were testifying to the declarations of Andrew J., himself, as to some fraud practiced upon the testator, it would not be competent. But this testimony does not reach even that point. It is only evidence of declarations of decedent about declarations of Andrew J. ; the former but hearsay and unsworn, and the latter denied. They are therefore doubly incompetent.

*Mr. Edward J. Fox* and *Mr. W. S. Kirkpatrick* (with them *Mr. B. F. Fackenthall* and *Mr. Frank Reeder*), for the appellees:

The plaintiffs in the issue did not allege that the testator was a lunatic, but they did allege that his mind and memory were seriously impaired by age and long continued brain disease, and that while in this condition he was prejudiced and his mind poisoned against all his other children except the one who gets the lion's share of the estate under this will and codicils, by most outrageous falsehoods poured into his ear for upwards of fifteen years.

1. We asked originally that the question of mental capacity should be included in the issue, but the request was refused. The recent decisions of this court have settled the law to be that the questions of undue influence and mental capacity are inseparable: Wilson's App., 99 Pa. 551. Undue influence is well defined: "The control of another will over that of the testator, whose faculties have been so impaired as to submit to that control, so that he has ceased to be a free agent, and has quite succumbed to the power of the controlling will:" 1 Redf. on Wills, 534–5. Undue influence is very nearly allied to fraud: Boyd v. Boyd, 66 Pa. 293. Fraud and imposition upon weakness is sufficient ground to set aside a will of real, much more of personal estate, though such weakness is not sufficient to ground a commission of lunacy: Lord Donegal's Case, 2 Ves. Sr. 408; 1 Wms. Exrs. 41; Hacker v. Newborn, Styles 427; Mountain v. Bennett, 1 Cox 355; Rambler v. Tryon, 7 S. & R. 93. The same condition of affairs which would set aside and avoid a contract for fraud or undue influence, by a court of equity, would be sufficient to invalidate a will: Bisph. Eq., §§ 230, 231, 232, 234, 235.

2. What kind of evidence is sufficient to convince a reasonable mind that undue influence has been exerted over the mind of a testator? We know that fraud cannot be presumed, but must be proved. But that proof may be gathered from an infinite variety of circumstances, and a wide door is opened for the admission of all evidence which throws any light upon the transaction, and no matter how trivial and unimportant a fact may be standing alone, it is not to be rejected, if it form but the smallest link in the chain of circumstances by which the

fraud is to be established: Delafield v. Parrish, 25 N. Y. 95; Tyler v. Gardiner, 35 N. Y. 593; Roberts v. Trawick, 17 Ala. 57. Our evidence upon this subject was of two kinds: (1) The proof by a number of witnesses of false representations made by A. J. Herster and his wife to the testator in reference to the conduct and habits of life of his other children, whereby the testator was induced to change a will made in 1870. (2) The other evidence bearing on the state of his mind and the undue influence exercised over him were the declarations of the testator made at various times, not of his intentions as to the disposition of his property, but as to the false representations which had been made to him in reference to his other children.

3. We do not pretend that there could be a parol revocation of the will, but we say that his declarations showed the condition of his mind, and for that purpose, under all the authorities, they were competent evidence: Reel v. Reel, 1 Hawks 268; Howell v. Borden, 3 Dev. 442. "Declarations of a testator are not competent evidence to show a revocation of a will admitted to have been once valid, nor to impeach the validity of a will for duress, or on account of some fraud or imposition practiced upon the testator, or for some, other cause not involving his mental condition. But such declarations of the testator, whether made before or after the making of the will, are competent evidence to show the mental incapacity of the testator, or that the will was procured by undue influence: " Bates v. Bates, 27 Ia. 113. In this state the declarations of the testator have frequently been admitted: Rambler v. Tryon, 7 S. & R. 93; McTaggart v. Thompson, 14 Pa. 153; Norris v. Sheppard, 20 Pa. 477. We do not contend that the declarations of a testator without other evidence would establish undue influence: Trost v. Dingler, 118 Pa. 259, but no man, lawyer or layman, who reads the testimony through, could escape the conviction that the testator was under the domination and control of Andrew J. and his wife, when he executed the will and codicils: Boyd v. Eby, 8 W. 70.

4. The defendants asked the court to take the case from the jury on the ground that the evidence did not rise to the standard which would move the court as a chancellor to decree the cancellation of the will and codicils on the ground of fraud.

What had we to impeach it? (1) The uncontradicted testimony of the physician that the testator had brain disease of a serious character, and that his mind was weakened and his memory impaired in consequence. (2) The will and codicils themselves showed a monstrous inequality in the division of his property: Patterson v. Patterson, 6 S. & R. 56; Baker v. Lewis, 4 R. 356; 1 Redf. on Wills, 415. (3) A. J. Herster stood in a relation to his father which was doubly confidential, that of parent and child, and that of one intrusted with his business affairs. (4) The fact that in 1870, when his mind was not weakened or impaired and he was free from prejudice, he divided his property equally among his children. (5) The fact that falsehoods were told him in relation to his other children. (6) His declarations showing that his mind was poisoned by the falsehoods. (7) His anxiety to get his will and codicils before he died, accompanied by his declarations that "it is all wrong."

OPINION, MR. JUSTICE CLARK:

This issue devisavit vel non was framed in the Court of Common Pleas of Northampton county to test the validity of the last will and testament of Andrew Herster, deceased, and of the several codicils thereto. The will was made and executed June 13, 1874; the first codicil August 29, 1878, and the second May 7, 1880. Andrew Herster died May 27, 1882, at the age of eighty-four years, possessed of an estate estimated at $200,000, leaving to survive him six children, viz.: Daniel Herster, Jacob Herster, Susan Keiper, Eliza Reich, Andrew J. Herster and William Henry Herster. Of these Andrew J. Herster is the principal devisee and proponent of the will, and William Henry Herster and Eliza Reich are the contestants. The only matter in issue, under the pleadings, is whether or not the will and the codicils, or any of them, were procured by fraud or undue influence; the contestants, who were plaintiffs below, maintaining the affirmative and the proponents the negative of that issue. That Andrew Herster was, at the time of making the will and codicils, of sound and disposing mind and memory, is therein assumed; no question can be made as to this; the only proper matter for consideration being whether that mind and memory were, in these testamentary acts or in

any of them, led captive by the artifice and undue influence of Andrew J. Herster, or of any other person in his interest, so that the written papers do not express the testator's true purpose in the disposition of his estate.

Undue influence is very nearly allied to fraud, yet they are not identical; whilst undue influence comprehends fraud, fraud does not embrace every species of undue influence: Redf. on Wills, 500 n.   It is only necessary, therefore, to consider the case upon the more comprehensive question of undue influence, for this will embrace all sorts of artifice, imposition, or bad faith which characterize acts of fraud.   Undue influence exists wherever through weakness, ignorance, dependence or implicit reliance of one on the good faith of another, the latter obtains an ascendency which prevents the former from exercising an unbiased judgment.   To affect a will, it must, in a measure at least, destroy free agency, and operate on the mind of the testator at the time of making the will.   The rule is well and forcibly stated by our brother GORDON in Tawney v. Long, 76 Pa. 115, as follows: "Undue influence, of that kind which will affect the provisions of a testament, must be such as subjugates the mind of the testator to the will of the person operating upon it; and, in order to establish this, proof must be made of some fraud practiced, some threats or misrepresentations made, some undue flattery, or some physical or moral coercion employed, so as to destroy free agency in the testator; and these influences must be proved to have operated as a present constraint at the very time of making the will."   It may, in the language of the learned judge of the court below, be exercised by means of misrepresentation and falsehood, directed against the persons who would be the natural objects of the testator's bounty, if the misrepresentation and falsehood so poisoned the mind of the testator as to destroy his free agency.

It is a matter of common knowledge, that a person of feeble intellect is much more easily influenced by undue means, than is one of a vigorous mind; therefore, in passing upon a question of undue influence, the strength and condition of the mind may become a proper, indeed an essential, subject of inquiry; for, although weakness, whether arising from age, infirmity or other cause, may not be sufficient to create testamentary

incapacity, it may nevertheless form favorable conditions for the exercise of undue influence.

It is contended on part of the contestants, that although Andrew Hester must be presumed to have had testamentary capacity at the time of the making of this will and the codicils thereto, and that cannot be questioned in this issue, yet both his mind and body had in fact been greatly impaired by the infirmity of age and by disease; that he was seventy-six years of age when he made his will, eighty when he made the first codicil, and eighty-two when he made the second codicil, and that he was aged eighty-four years when he died; that for twenty-five years he had suffered from a progressive general paresis, or softening of the brain; that he had an apoplectic seizure a short time before the execution of the will, and that his memory was much impaired and his mind generally enfeebled; in other words, that although the testator's mind was not enfeebled to the extent of testamentary incapacity, yet it was so weakened by disease and old age as to make the testator an easy prey to the artifice of his son, and that Jackson took advantage of his father's weak condition to procure the will to be made in his favor. The proponents of the will, on the other hand, contend that the testator was of a strong, robust and resolute mind; that, although advanced in years and afflicted to some extent with the disease stated, he conducted business, successfully and extensively, throughout the whole period of his affliction and until within two weeks of his decease; that he was engaged extensively and profitably in the purchase and sale of cattle; that he kept his own accounts, made his own calculations, and drew his own checks in payment, until the month in which he died; that within a year prior to his death he paid to three of the witnesses alone, for cattle, over $26,000, and within four months and one half before his death, had paid out with his own checks, to different persons, for cattle, over $11,000; that it was the result obtained in his various business transactions after the making of his will, which made further testamentary provision necessary; that Jackson, his son, had been a good boy, had remained at home with his parent, and had rendered him valuable and important services; that the old man had a high opinion of his son's business capacity, and, on that account, often deferred to his judgment in

business matters, and that the provisions in his will and the codicils in his favor, were a free and voluntary act of his father, prompted perhaps by his affectionate regard for his son, and a consideration of his personal services and worth.

It will be seen therefore, that undue influence is the substantial fact affirmed on one side, and denied on the other; imbecility or weakness of mind being a collateral or extraneous question arising out of the proofs.

The declarations of the testator, made within a reasonable time before and after the execution of the will, have always been received in evidence upon a question of testamentary capacity, to show the state and condition of the testator's mind, and, if reasonably connected in point of time with the testamentary act, we cannot see any reason why they would not be admissible to establish the same fact in an issue raised upon the exercise of fraud and undue influence in the procurement of it. Such declarations cannot have any force, however, in establishing the substantive fact of undue influence. "It is certain such testimony is not admissible for the purpose of proving any distinct fact depending upon the force of the admission, since the testator is not a party to the question of the validity or interpretation of his will:" Comstock v. Hadlyme, 8 Conn. 254; Redf. on Wills, 539. "The object of this testimony is to show such a state of weakness or vacillation of mind, as rendered the testator an easy victim either of artifice, force or fraud. Such declarations afford most satisfactory evidence, not only of the strength of mind, but often exhibit those peculiar phases of the mind, and of the affections, which especially expose the testator to be overcome by the terror of threats or the seductions of flattery. And although these declarations will necessarily afford some ground for judging in regard to the effect of any attempts at undue influence, that element in the testimony not being legitimate, it can only be eliminated by the judge in summing up to the jury:" Ibid. 548. "It is apparent that the declarations of the testator that he did not execute his will freely, that he never intended to have made such a will, and never should, but for the influence of those persons in whose favor it is made, and similar declarations, which are very common in the testimony elicited in testamentary causes, can be of no force whatever as testimony

tending to establish the truth of the declarations. In that light, such declarations are mere hearsay, depending for their force upon our confidence in the veracity of the person making them, and in most cases easily explained, without regard to the question of their truth, and have always been rejected as evidence: Ibid. 530.

Testamentary capacity being the normal condition of a person of full age, it follows that, in the absence of evidence of undue influence, proof of the testator's declarations should be excluded or wholly disregarded on that question. Therefore, in Moritz v. Brough, 16 S. & R. 403, it was held, that to set aside a will, duly executed by a man of competent understanding, evidence is not admissible of declarations made by him, that he intended differently and was importuned by his wife; or, of the wife's high temper and importunities with the testator, in relation to his will. So, in Hoshauer v. Hoshauer, 26 Pa. 404, the testator's mental capacity was not disputed; the will was made in 1853; to show undue influence, the contestants offered to prove that in 1855, the testator said he had "made a will;" that he had "made it as John wanted it;" that he had "to make it as John wanted it," and that he "knew it was wrong." The offer was rejected and upon error it was held that it was rightly rejected. Mr. Justice LOWRIE, delivering the opinion of the court, said: "This could not prove fraud in procuring it, though nearly all the estate was given to John's children, himself getting a dollar. An instrument, that for two years remained subject to change or cancellation at the maker's pleasure, cannot be set aside on such a declaration. A man who is competent to make a will can so easily correct any of its provisions, however obtained, that it is hard to imagine any kind of declarations of his that would prove it to be fraudulent, when any considerable time has intervened between its execution and his death." So also, in McTaggart v. Thompson, 14 Pa. 149, where the validity of a will was questioned both for want of testamentary capacity and for exercise of undue influence, the contestants offered to prove the testator's declarations, made after the execution of the will, to the effect that in the making of it he had been imposed upon by those in whose favor it was made. The offer was refused, and upon that ground the case was removed to this

court. "The court appears," said Mr. Justice ROGERS, "to have excluded the testimony, because they chose, contrary to the offer, to suppose it was designed to prove duress, for which purpose it would be clearly inadmissible. But the court had no right to act on the supposition that the testimony was proposed in bad faith. As it was offered for a legitimate purpose, for that purpose it ought to have been received. If attempted to be used for a different purpose, the correction was in their own hands; the counsel would subject themselves to the severest censure. If the facts were as represented it was evidence of imbecility of intellect amounting almost to fatuity." To the same effect is the current of authorities in other states: Robinson v. Hutchinson, 26 Vt. 38; Richardson v. Richardson, 35 Vt. 238; Shailer v. Bumpstead, 99 Mass. 112; Kinne v. Kinne, 9 Conn. 102; Provis v. Reed, 5 Bing. 435; Jackson v. Kniffen, 2 Johns. 31; Pemberton's Will, 4 Atl. R. 770; Waterman v. Whitney, 11 N. Y. 152; Stevens v. Vancleve, 4 Wash. C. C. 265. In order that the declarations of the testator may be considered at all, upon an issue of undue influence, there must be proof of other facts and circumstances indicating circumvention or fraud in the procurement of the will: Tawney v. Long, supra; for they are received, not as proof of the fact, but merely to show that there are special grounds for apprehending and unusual opportunities for exercising undue influence, and to illustrate the effect of such influence after its existence has been established; unless, perhaps, as part of the res gestæ, when they are made at the very time of the execution of the will, and form part and parcel of the transaction: Smith v. Fenner, 1 Gall. 172; Boylan v. Meeker, 4 Dutch. 274; Harrison's Appeal, 100 Pa. 458.

The weakness of mind and consequent susceptibility to influence which is admissible in such a case, must be shown to exist at the very time of the testamentary act; whilst the testator's declarations directly show only the state of his mind when they were made. Declarations made before and after have some significance, however, in showing, inferentially, the mental condition at the time of the testamentary act. The limitations, which govern the admission of this quality of evidence, must depend largely on the character of the unsoundness attempted to be proved. There are types of mental

unsoundness which appear suddenly and may be of short duration, and in such cases, the proof, to be of any avail, must come near to the precise time when the act was performed; but the decadence of old age and many forms of mental derangement and imbecility are of slow advancement, and proof of their distinct development, at any given period, will afford pretty clear ground to infer their existence for a long period, either before or after, with a considerable degree of certainty: Grant v. Thompson, 4 Conn. 203. Therefore, declarations made several years, even, before the execution of a will, may be proven to show unsoundness or imbecility of mind of a permanent character; and declarations made after may, in like manner, tend to show such a fixed perversion or imbecility of mind, as would not be likely to have occurred in any short period of time; and both or either may afford some just ground of opinion in regard to the state of the testator's mind at the date of the testamentary act: Redf. on Wills, 549. The court must judge, in each particular case, how far it will be profitable to extend the rule before and after the precise date in question: Grant v. Thompson, supra.

As the proof of the testator's declarations are only admissible in this case to show the state of his mind, and the effect of undue influence, if any is shown to have existed, we cannot say, in view of the particular type of mental unsoundness alleged, and the peculiar circumstances of this case, that the scope of the investigation was too wide. Of course the objective point of inquiry, in every case, is the state of mind at the precise date of the testamentary act, but, as it is not practicable, in all cases to make that inquiry in a direct manner, some latitude of proof must be allowed.

At the first trial of this case, the learned judge of the court below instructed the jury, in the most explicit and proper manner, that these declarations of the testator were not evidence at all, as to the fact of undue influence, because there was no evidence that they were true; "for all that appears," says the learned judge, "they may have been the expression of a mere delusion on the part of the testator." At the second trial, however, the court received the evidence and submitted it to the jury, without any qualification whatever. Whether this omission was the result of a change of opinion

respecting the force of the evidence, or was a mere inadvertence, or whether the learned judge inferred from the opinion of this court delivered when this case was here before, that such declarations were deemed proper evidence of undue influence, we cannot say; of one thing we are certain, that the failure to qualify the effect of this evidence was fatal to the defendants' case. There is, in the concluding clause of the opinion referred to, enough perhaps to give the impression, that the declarations of the testator made a few days prior to his death, as to his unsuccessful attempt to get possession of his will from Lynn, followed by his exclamation on the day of his death, "Mein Gott in Himmel, es is alles letz, alles letz," my God in heaven, all is wrong, all is wrong, were deemed proper evidence of undue influence. But the law is too well settled on this point to admit of any doubt. The testimony was admissible, perhaps, but it was for the consideration of the jury only in a certain event, and then for a special purpose, to show the state and condition of the testator's mind; and as the declarations were made eight years after the execution of the will, and four years and two years after the making of the codicils respectively, and then were uttered almost in the last moments of the testator's life, they were, it must be conceded, of little force or inferential effect, under the circumstances, even as to that. We then said in advance we could not "say that the answers to the proposed questions would not indicate the exercise of undue influence," etc. Now that the answers are before us, we can without any hesitation say that they are not. The defendants' counsel, by a point more particularly directed to this branch of the evidence, might have directed the attention of the court to the proper application of this part of the evidence in a more direct manner than appears to have been done; but we think the question is raised in the answers to the defendants' fifth and sixth points. Although these points were not directed to the precise question now under consideration, yet the answers of the court proceed plainly upon the assumption, that the testator's declarations might be regarded as indicating undue influence, or present constraint, operating upon the mind of the testator in the testamentary act; and upon this ground the judgment must be reversed.

In the former opinion of this court, it was held that the evi-

dence was sufficient to justify a submission to the jury. The testimony was then and is now very voluminous, the evidence embracing over one thousand pages of printed matter; and, perhaps, we did not give it that exhaustive examination and patient study which we have since been able to do. The whole case is now before us, and we are constrained to say, that the testimony bearing upon the precise question at issue is certainly of the most meagre, unsatisfactory and inconclusive character.

It is said that Jackson Herster stood in a confidential relation to the testator; that he was the testator's son, and was to some extent intrusted with his father's business; but he was not present at the making of the will, nor does it appear that it was made by counsel at his procurement. The testator went to Mr. Lynn, who had been his attorney and counsellor for fourteen or fifteen years, and, in the absence of all his children, with the greatest deliberation arranged for the preparation of his will. That Jackson was a son was certainly in his favor; that he was intrusted with his father's business and, in this respect, occupied a confidential relation towards him is also a circumstance in his favor, if he performed his duty faithfully and well, and did not take advantage of his position, or abuse the confidence reposed in him in the procurement of the will. There is not the slightest proof that he took any part in the actual preparation of the will or of any of the codicils; indeed, that he was even present when they were made and written or when they were signed. Under these circumstances the burden of proving undue influence is clearly upon those who allege it.

The unequal disposition which the testator made of his property, under the circumstances of this case, is not of great significance. "There may be cases," as was said in Patterson v. Patterson, 6 S. & R. 56, "where this internal evidence added to other proof, which would of itself leave the question doubtful, ought to turn the scale." But the inequality in the provisions of this will, taken in connection with all the evidence referred to, is not such as would induce any reasonable belief, that, in the making of it, the testator was acting under any improper influence; and, especially is this so, in view of the evidence which has been introduced to explain the reasons, and

disclose the motives, which probably actuated the testator in this disposition of his property. The very object of making a will is to disturb the equality of distribution which the law establishes in the absence of one; and, whether the reasons for it, in the testator's mind, are well or ill founded, is immaterial, if he has arrived at the result, of his own volition and without any fraud, coercion or constraint of others. It is only when the will is grossly unreasonable in its provisions, and plainly inconsistent with the testator's duty to his family, that, in case of doubt, the inequality can have any effect on the question of undue influence. The evidence in this case is not, in our opinion, of such a character as to leave the question at issue in doubt. On the contrary, the uncontradicted proofs abundantly explain the testator's motives in making his will as he did.

Apart from the internal evidence supposed to be afforded by the will itself, and the confidential relation referred to, and applying the declarations of the testator as evidence of the state and condition of his mind, the evidence of undue influence consists mainly of the testimony of five witnesses, viz.: Amandus Frey, Charles Halbing, Hannah Weaver, Samuel Weidnecht and Henry Weidnecht. The circumstance related by Amandus Frey is of the most inconsequent character. In the year 1880 or 1881, he told the testator he had a lot on College Hill that Jacob would like to have; the price was $7,500; the old man promised to go up and see; failing to do so, Frey went to see him again. He says: "I told him, 'Daddy, you did not come up to see my place.' He said, 'No, I did not;' then he said something about having a fall and hurt his thumb or finger, I forget what it was, and he couldn't get up, but that his son Jake told him that the property was cheap, and they might as well buy it, because they had the money lying idle; but he said 'I'll see Jack first;' and then he called Jack, and he told Jack about it and said, 'Here's Frey about that lot on College Hill; Jake says it is cheap and we might as well buy it;' Jack said, 'No father, we have got enough borough property; if we want to buy property, buy farms.' Then the old gentleman said, 'Well, if you say so, all right,' and that ended the matter."

Charles Halbing lived in the testator's family from April, 1880, for nine months; he returned in the spring of 1881, and left some time previous to the old man's death. His testimony

Opinion of the Court.

relates chiefly to the conversation of the family whilst at their meals. In speaking of what Jack and his wife said at the table, in the old man's presence, he says: "They allowed that Jake's children were running around and spending their money, and if he got such things he would not take care of them."

Q. Was this said upon more than one occasion, or only once? A. Frequently.

Q. What effect did it have apparently upon the old man; what would he say? A. Well, he would generally side in with the family.

Q. Did you ever hear anything said about Henry or his wife or children? A. Yes, I did.

Q. What did he say about them? A. Well, no offence to the lady there or the family; I shall speak the remark as it was spoken at the place.

Q. Who said it? A. Jack Herster; "Beck, fat Beck."

Q. What did he say about them besides? A. Well, that the children were no good, running around and out on the streets nights, and Hen. Herster running around and the like of that.

Q. Did you hear Jack say anything about his sister Susan? A. Yes, Mrs. Keiper and her Rosa.

Q. What did he say about her? A. That they were a stuck up set, and that if they got anything they would not take care of it.

Q. When they said this what did the old man say? A. Well, the old man would side in with them; he would have the same opinion, apparently, to me.

Q. Did he say anything about Eliza, Mrs. Reich? A. Yes.

Q. I mean Jack; what did Jack say? A. As I understand, Mr. Reich stole a cow and drove her to Allentown or Catasauqua —I am not certain which of the two places—and sold his cow, and the old man, of course, had bitter feelings against Mr. Reich on that account, and I have often heard the remark made that they should not have anything.

Q. Heard Jack say it? A. Yes.

Q. Was anything said about Dan by Jack? A. Yes.

Q. What? A. Said that Dan was a drunken man and did not take care of his business; that he owed the old man so much money, for cattle as I understood, and that he had had enough for his share, and would not get any more; and his Irish woman and the two boys, they wouldn't get nothing.

Q. Dan's wife was an Irish woman, was she? A. As I understand it, yes.

Q. What effect did that have on the old man? A. Well, he would have the same opinion.

Q. Would he be in a good humor or angry? A. He certainly would be out of humor when the rest spoke that way, and he would side in with them.

Q. Would he swear any? A. He never would curse any; often times in German he would use an oath, but I never heard him go to the extreme.

Q. What would he say in German? A. He would say, "Sockerment" and the like of that.

Hannah Weaver was employed as a servant in the family in the year 1877. She says: "Rose Keiper—that was Susan Keiper's daughter—yes, she came there one day; I think it was on Saturday, and she came there with some flower seeds, and she had a brown silk dress on, and the door was open between the kitchen and the old man's room, and so I said: "Was that Miss Keiper," after she was gone, and she said: "Yes, that was Rose Keiper; but she would not need to put a silk dress on to come up here to me," and then the old man said something, but I am not positive what he said, but he was very angry about it.

Q. Did Mrs. Herster say anything more to him about not holding out, or anything of that kind? A. Oh, yes, she said that wearing them silk dresses, she said that that would not hold out, and then the old man said: "Yes, it wont if they have got to have it from me;" something in that way it was.

Q. Do you remember on different occasions anything being said to the old gentleman about the different children, by Mrs. Andrew Herster; do you remember anything being said there at breakfast about not being able to sleep at night? A. Yes; one morning the old man got up and was angry— that was the old man Herster.

Q. Who else was there then? A. I and Jackson and his wife and the boys at the table, and then they said they could not sleep at all last night.

Q. Who said that first? A. Why Jack.

Q. Then what did the old man say? A. That he could not sleep neither, and then Jack said, "Yes, they were playing on the piano all last night."

Q. Who? A. Why Jack said that, that he could not sleep; that Henry's children were playing on the piano all night, and then he said, " Yes, he better—

Q. Who? A. Why the old man said he better learn his girls to play on the piano; but when Clara comes round I will give it to her.

Q. What did Mrs. Jack Herster say? A. " Yes," she said " If I had girls you bet they would learn to milk."

Q. What was the old gentleman's manner? A. Well, he was cross, angry.

Q. Did you ever hear any piano playing over there? A. No, I slept on the third story and I did not hear any.

Q. Did you ever hear any piano playing over there? A. No; I heard a little music over there, but I don't know what it was, whether it was an accordion or a mouth organ or whatever, but I never heard a piano.

Q. Do you remember anything being said about how the piano was brought there? A. Yes; the piano was brought in there and it was so large they couldn't hardly get it in the house.

Q. Who said that? A. Mrs. Jackson Herster.

Q. When? A. The same morning at the table; she said that they brought the piano and it was so large they could not get it in the door hardly, and it is about all that was said.

Q. Do you remember on any other occasion, when anything was said about Daniel? A. I think it was something, but I cannot just remember how it was.

Q. Do you remember anything being said about his being drunk? A. Yes, it was said that he was a regular drunkard.

Q. Who was that by? A. It fell at the table but I cannot tell whether it was Jackson or his wife, it was either one; they said it to the old man and I sat by and heard it.

Samuel Weidnecht testifies, that the old man in any business matter would generally have his own way with other people, but he generally agreed with Jackson.

Henry Weidnecht says, that the old man seemed to be guided a great deal by Jackson, and was different in his manner toward Jackson from what he was to other people.

Reuben Kolb testifies, that he seemed to be a little afraid of Jackson, that is, more yielding; that he was usually a man of

much determination and was firm in his opinion with others, but that he yielded readily to Jackson.

This is a summary of all the testimony bearing directly upon the fact of fraud or undue influence, and consisting as it does of matters occurring some three years and some six years after the will was made, it is certainly of the most inconclusive character. There is, in our opinion, no evidence from which a jury would be justified in inferring fraud, duress or undue influence in the making of this will. In an issue devisavit vel non the question of mental unsoundness, or of undue influence, ought not to be submitted to the jury where the evidence is of such unsatisfactory character that the court would not sustain a verdict upon it: Wilson v. Mitchell, 101 Pa. 505. " A court of law," says our brother PAXSON, in Cauffman v. Long, 82 Pa. 72, "has a higher duty to perform than merely to answer points of law. It is its duty to see that the law is faithfully administered, and such administration requires that a man's will, the most solemn instrument he can execute, shall not be set aside without any sufficient evidence to impeach it. There is no redress here for an erroneous or improper verdict. But where a case is submitted to a jury upon clearly insufficient evidence, such as no court ought to sustain a verdict upon, it is our plain duty to reverse: Sartwell v. Wilcox, 20 Pa. 117; Lower v. Clement, 25 Pa. 63; Silveus v. Porter, 74 Pa. 448." "This court has indicated in a number of cases," says our brother GREEN, in Herster v. Herster, 116 Pa. 612, "a rule by which to determine the granting of an issue, and it is equally applicable in determining whether a cause of this kind ought to be withdrawn from the jury. It is thus expressed in a recent case: 'If the testimony is such that after a fair and impartial trial resulting in a verdict against the proponents of the alleged will, the trial judge, after a careful review of all the testimony would feel constrained to set aside the verdict, as contrary to the manifest weight of the evidence, it cannot be said that a dispute within the meaning of the act has arisen. On the other hand, if the state of the evidence is such that the judge would not feel constrained to set aside the verdict, the dispute should be considered substantial and an issue to determine it should be directed. This simple and only safe test is supported alike by reason and authority:" Knauss' App., 114

Pa. 10." Applying this rule, which would seem to be well settled, to the evidence in this cause, it must be conceded, we think, that it is wholly insufficient. Upon a careful review of all the testimony this verdict could not be sustained ; the court should have set it aside as contrary to the manifest weight of the evidence. And if this is so it is, on an issue devisavit vel non, good ground for reversal here.

The facts exhibited in evidence in this case to establish undue influence are, in general, of the most trivial character. The most grievous matters alleged are that Jackson said Eliza Reich's husband stole a cow, and that Dan was a drinking man—facts, however, which do not seem to be seriously denied. It does appear that Henry never had a piano, and it is probable that the old man knew that he had not, as he was actively engaged about the house for five years after this alleged misrepresentation. Statements to the effect that Jacob's children were " running around spending their money ; " that Henry's were " out on the streets nights " and that Mrs. Keiper's were a " stuck up set," are criticisms that may have been well or ill founded, according to the stand point from which their conduct was observed and the peculiar notions and temper of the observers. At the best, however, they have little, if any force in establishing fraud or undue influence in the procurement of this will or of the codicils. And especially is this true in view of the fact, that the alleged declarations were not only made after the will was executed, but several years after. There is some evidence of mental impairment, but the testimony is overwhelming that notwithstanding this impairment the testator retained a business capacity rarely found among persons of his age, who have never been afflicted as the testator was. There is no evidence whatever of any statements made by Jackson or his wife to the prejudice of his brothers and sisters at, or at any time before, the making of the will. In order to invalidate a will there must be evidence direct or circumstantial of a present operating restraint at the time of making it : Eckert v. Flowry, 43 Pa. 52 ; Wainwright's App., 89 Pa. 220. Influences which do not appear to be connected with the testamentary act are not sufficient to impeach a will : McMahon v. Ryan, 20 Pa. 329.

If we are right in the views we have already expressed, it is

Syllabus.

wholly unnecessary to consider the several assignments of error in detail. The plaintiff has made no case for the consideration of a jury; and, as the whole case must go down, all questions incidentally arising during the progress of the trial go down with it.

The judgment is reversed.