## Lappe, Appellant, *v.* Gfeller.

*Will—Probate—Issue devisavit vel non—Forgery—Fraud—Evidence.*

On an issue to determine the validity of a will alleged to have been left by testator but destroyed after his death, where the defense is that the paper in question came into existence, if at all, by fraud and forgery, declarations and statements of the decedent are admissible, where it appears that they are inconsistent with the existence and validity of the will, and contradictory of the story of the proponents in regard to the execution of the instrument.

*Practice, C. P.—Trial—Charge—Expression of opinion.*

The trial judge may in his charge express his opinion and make comments on the testimony, witnesses or parties, provided he leaves the jury free to decide the case on the evidence.

Argued March 27, 1905.    Appeal, No. 46, Oct. T., 1905, by plaintiffs, from judgment of C. P. No. 1, Allegheny Co., Dec. T., 1904, No. 16, on verdict for plaintiffs in case of Chas. O. Lappe et al. v. Anna M. Gfeller et al.    Before FELL, BROWN, MESTREZAT, POTTER and ELKIN, JJ.    Affirmed.

Issue devisavit vel non.    Before COLLIER, P. J.

The facts are stated in the opinion of the Supreme Court.

At the trial the following offer was made:

Defendant's counsel proposes to show by Mr. Hartmeyer, the present witness, that Mr. Lappe came to his house in the spring of 1901, either in the latter part of March or the beginning of April; that he showed Dr. Hartmeyer a will, which read, " The last Will and Testament of John Christian Lappe of Allegheny City"; that he wanted Dr. Hartmeyer to read it, and Dr. Hartmeyer did not want to, and finally told him to put it in his pocket and take it away with him ; that he said the will was not right, and " I will not have it," but finally I told him to put it in his pocket and take it away with him.

That he came back probably in about two or three days again with Mr. Robitzer ; that he made Mr. Robitzer remain outside ; that he then said the will was not right; that he would n't have it, and that the doctor told him he could change the will, or tear it up, or destroy it, it was his will.    He said, yes, he could do that.    The doctor then told him that if he

would destroy the will the property would go to his children share and share alike, and he said that was what he wanted, that he was dissatisfied with the will that he had, and that that is what he wanted.

Objected to by plaintiffs' counsel as incompetent and irrelevant, because it is hearsay and an attempt to introduce a declaration of the testator, and that it is not in any way connected nor is it proposed to connect it with the will now in controversy.

The Court: We will hear the evidence for what it is worth. Exception noted to plaintiffs. [1]

"Q. Now, can you tell us what month this was?  A. I think it was in the month of April, 1901.  Q. What did he say at that time?"

Plaintiff's counsel renew their objection that it is incompetent and that it is hearsay, and that the declaration of the testator is not admissible.

The Court: We have ruled that the doctor can testify that he had a will with him, and wanted to show him a will, and what he said about it.  Exception noted to plaintiffs.

"Q. Now tell us what took place at that time.  A. About what you read there?  He came to my office and insisted on my looking at a paper and told me it was not right.  Q. What was the paper?  A. It was a will.  Q. What did he call it? A. It was a will.  Q. Did you look at the will?  A. Yes.  Q. Did you notice anything on the will—any indorsement on the will?  A. I saw it was the last will and testament of John C. Lappe of Allegheny City.  Q. What did he say at that time?  A. He wanted me to read it.  I first refused to read it.  I said ' It is your will and I have n't anything to do with it.  You better take it away with you.'  He came back and insisted on my reading it. Q. How long afterwards?  A. I could n't be specific.  I would say two or three days, it may have been one day.  I could n't say for certain.  It was some time ago.  The drift of the conversation was that he wanted to destroy this will, or in other words he wanted me to destroy it, which I refused to do.  I finally persuaded him to take it away, and he worried me until about some time in May of the same year, 1901, when he finally sent for me one evening and had destroyed this will and I made this explanation to him.  Q. What explanation?  A. I told

him that if he felt that the will was n't right, he had a right to destroy it. Q. Did he say he had destroyed it? A. Yes, sir; he had torn it up. I said he could revoke it, or make a new will or could do as he pleased, as he was disposing of his own goods, and it was for him to do as he saw fit. I said, ' Do as your conscience tells you.' I said, ' Of course you understand if there is no will the state makes a will; if I understand it correctly it will make a division of your property to your children share and share alike.' He said, ' That is what I want.' Q. He said that was what he wanted? A. Yes, sir. Q. And that was in May, 1901? A. Yes, sir."

Henry Gerwig, a witness called by defendant, after describing the breaking open of the safe deposit box, in answer to the question if it were broken open, said:

" A. Yes, sir, broken open, and he took out this will, he gave it to me, showed it to me, and I said, ' Why, Christ, this is your will.' He said, ' ɪes, it is my will.' So he looked over it, and he asked me to look ·er it, and I looked over it."

Plaintiff's counsel objected to the declaration of anything that was said by Mr. Lappe, as being hearsay and incompetent.

The Court: We are inclined to think that any declarations he made, by saying, " This is my will," are all right, but he cannot give the contents of that will.

Mr. Marshall: I wish to show that he said that the will did not suit him, that particular will that he was then speaking about.

The Court: We will hear it. Exception noted to plaintiff. [2]

Mr. Marshall: " Q. Go ahead. A. We then put on a new lock. Now, says I, ' You want to put this will back again?' He says, ' No, I want to take it along.' He put it in his inside coat pocket and we went over to the house. Then he took me upstairs and he locked the door. Then he gave me the will to look over, told me to look it over, and I asked him whether it was not right, whether it was n't what he wanted. He said no, he did n't want it, it was n't right, and he then asked me what he could do."

Mrs. Anna Bernhart was asked these questions.

" Q. Did you hear him speak about a will at any time in the spring of 1901? "

Objected to by plaintiff's counsel as incompetent and irrelevant.

Defendant's counsel proposes to prove by the witness that she visited Mr. Lappe on Decoration Day. He wanted her to take his will and a deed of a cemetery lot up to Mr. Eichenlaub for him to keep for safe-keeping; that he expressed himself as being afraid that some one would get hold of the papers. That was to show that he wanted her to take his will, and put it in her hands; that she didn't want to take it, and finally did not take it but that he mentioned it was his will and also this deed for the cemetery lot.

Objected to as incompetent and irrelevant.

The Court: The objection is overruled. Exception noted to plaintiff. [3]

" Q. Did you hear him speak about a will at any time in the spring of 1901? A. Yes, sir. Q. State the circumstances, date, and how you remember it. A. Well, he sent word out for me to come in; he always gave me money to get flowers for my daughter's grave. I went in that day and went in through the kitchen, and he was in there, and when I went in he said that I should come upstairs, he had something to give me to take to Uncle Ed., that is Mr. Eichenlaub, my brother-in-law.

"When we got into the hall he gave me a dollar bill to get the flowers. When we got up stairs, I didn't go into the room, but just stood between like, and he came from the dresser and he had some papers wrapped up in a newspaper, with a string tied about it, and two pocket-books. He says, ' This is my will and my testimony,' that is will in English, and a deed of a lot in. Homewood cemetery.' He says, ' Take them home to Uncle Ed.' "

Charles Eichenlaub, a witness called by the defendant, testified as follows:

" Uncle, here is a paper—is that what-you are looking for? " He says, ' Do you want to see that?' and I said, ' No, Uncle, what is in it?' He says, ' That is my will.' That is all he said to me."

"Q. What was the paper like? A. It was a newspaper, I judge about that long (indicating), wrapped up with a string. I laid the shirts back on it, and said, ' Uncle, I do not think it is any of my business to see what is in it.' He said, ' That

is my will.'   Q. How was it in respect to size, as to the size of an ordinary large envelope?   A. If you take just a few papers and bundle them up as you would in a large envelope. Q. Wrapped in newspaper?   A. Yes, sir.   Q. And a white string around it?   A. Yes, sir."

Mr. Jackson: I want to ask the court whether or not this is taken subject to our objection already on the record.

The Court: We sustain the objection.   He said he "opened the drawer and found a paper and he said it was his will."

We will strike out the balance of the testimony, except that "he said it was his will" under the same objection as to the competency.

Exception noted to plaintiffs. [4]

Mrs. Sarah Lappe, a witness for defendant was asked:

"Q. When did he talk to you about the will, or anything about the will; when was it and what was it?   A. Along about a few weeks before he took sick, he said he was dissatisfied about the home.   I asked him what was the matter, why he was dissatisfied.   He said he didn't want to stay there any more, that he wanted to go away.   I said, 'Why, pap, this is your home; what do you want to go away for?'   He said, 'Well, this is not—'"

Objected to as incompetent and irrelevant.

The Court: Objection overruled and exception to plaintiff. [5]

"Q. Go ahead.   A. He said that he was going to give it to ——.   He said Mrs. Wettach was going to get the house and she might as well have it now, a few weeks sooner as a few weeks later.   He said, 'She was going to get the house anyway.'"

Anna Gfeller, a witness for the defendant, was asked:

"Q. Within a few months of the time that this so-called will of December 20, 1900, was made, did you hear Mr. Lappe say anything about Emma Robitzer or John Robitzer, her father? A. Yes, sir.   Q. When was it?   A. About six weeks before he died."

"Q. What did he say?"

Objected to by plaintiff as incompetent and irrelevant, and because it is too remote from the time of the making of the will, and is hearsay, and as otherwise incompetent.

The Court: Objection is overruled. Exception noted to plaintiff. [6]

"Q. What did he say? A. He said, 'I do not trust Emma or Uncle John.'"

Verdict and judgment for defendants. Plaintiffs appealed.

*Errors assigned* were (1–6) rulings on evidence, quoting the bill of exceptions; (7) that the charge was inadequate and misleading.

*S. W. Childs*, of *White, Childs & Scott*, with him *R. H. Jackson*, for appellant.

*J. M. Stoner*, for appellees.

OPINION BY MR. JUSTICE MESTREZAT, APRIL 10, 1905.

John Christian Lappe, age eighty-five years, died at his home in Allegheny city on July 25, 1901, and was buried two days thereafter. He left to survive him children of a first and second marriage, grandchildren who were children of two deceased daughters of the first marriage, and a stepdaughter. On the day of the funeral a fruitless search for a will was made at his residence when all the parties interested in the estate were present. In about ten days thereafter, with the consent of all the interested parties, letters of administration on his estate were granted to the Fidelity Title & Trust Company of Pittsburg. Some months later Anna M. Gfeller, his stepdaughter, offered for probate to the register of wills of Allegheny county a will of the deceased dated August 10, 1900. The validity of this will was denied and its probate resisted. An issue was certified by the register to the court of common pleas No. 2 of Allegheny county, in which Anna M. Gfeller was made the plaintiff and Emma Morgenroth and the other plaintiffs in the present action, with possibly one or two exceptions, were made the defendants. The verdict of the jury sustained the validity of the will, and the judgment entered on the verdict was affirmed by this court January 4, 1904. (208 Pa. 48). Miss Gfeller, the proponent of the will, again presented it for probate to the register of wills on January 29, 1904. The plantiffs in this issue objected to the probate on the ground that a

later will of the testator, dated December 20, 1900, had been discovered in the possession of Emma Morgenroth and her husband. The register thereupon issued a precept commanding the court of common pleas No. 1 of Allegheny county to form and try an issue whether the deceased did, on or about December 20, 1900, sign the paper writing of that date "as and for his last will and testament." The trial in the common pleas resulted in a verdict against the validity of the proposed will and in favor of the defendants. From the judgment entered on that verdict we have this appeal.

The genuineness and validity of the alleged will of December 20, 1900, are supported principally by the testimony of Emma Morgenroth, nee Robitzer, and her husband, Ed. R. Morgenroth. Mrs. Morgenroth is a daughter of Rosanna Robitzer, who was a daughter of John Christian Lappe by his first marriage. The testimony of Mrs. Morgenroth and her husband is substantially as follows: Emma Robitzer lived with the deceased in Allegheny city, and on the evening of December 20, 1900, her fiance, Ed. R. Morgenroth, called to see her. Sometime after he had arrived at the residence of Mr. Lappe, the latter came down stairs and requested them to come up to his room. After the three had entered his room, Mr. Lappe closed the door and told Miss Robitzer and Mr. Morgenroth that he had something he wanted to tell them and enjoined the utmost secrecy upon them in regard to it. Mr. Lappe then drew an envelope from his pocket and took a paper from it which he called his "testament." It was a typewritten paper of three pages, fastened at the top and dated with the month and the year. Miss Robitzer procuring a pen and ink, Mr. Morgenroth filled in the day of the month, and Mr. Lappe then signed the paper and the other parties witnessed it. He put the executed will in the envelope which he replaced in his pocket. Miss Robitzer and Morgenroth then returned to the sitting room. The next time Miss Robitzer saw the paper was the first week of the following March (1901), when the deceased brought it to her room. He said he was afraid his boys might find it and he handed it to her with instructions to take care of it. On being told by her that it would not be more secure from the boys than if he had it, he told her to give it to Morgenroth. Subsequently she gave it to Morgenroth in a Wood street cafe, where they

both read it.   She next saw the paper July 25, 1901, the day her grandfather died, at the shop where Morgenroth was employed.   She was then advised by her uncle, Dr. Lappe, and subsequently by two other uncles, that the paper was not a valid will because she was a beneficiary and had witnessed it.   She and Morgenroth were married July 27, the day her grandfather was buried.   Being persuaded that the will was invalid, Mrs. Morgenroth destroyed it, prior to which, however, her husband, with her assistance, had made a copy of it in an old memorandum book.   This was just before the Morgenroths removed from Pittsburg to Denver in September, 1901.   They have since resided in the far west.   In February, 1904, on request of appellant's counsel, the copy of the will made by Morgenroth was sent to Pittsburg to be used as evidence in the trial of this issue.   Neither Mrs. Morgenroth nor her husband spoke of the alleged will of December 20, 1900, or made any reference to it when they assisted the other interested parties in a search of Mr. Lappe's residence for a will of the deceased, or when, ten days later, they conferred in regard to the appointment of an administrator of his estate, or during the litigation over the will of August 10, 1900, in which Mrs. Morgenroth was a party defendant.

Such in brief is the story told by Mrs. Morgenroth and her husband as to the execution, custody and destruction of the alleged will of December 20, 1900.   Charles O. Lappe and Martin Lappe, children of the first marriage, testified that they were shown this will by Mrs. Morgenroth and that their father's signature to it was genuine.   The defendants deny the validity of the will and attack it on the grounds of fraud and forgery.   For the purpose of contradiction, the defendants, in addition to other evidence, proved the acts and declarations of the decedent during the three or four months immediately prior to his death.   This was after the alleged will of December 20 had been delivered to Mrs. Morgenroth and while she and her husband had the custody of it.   The admission of this testimony, showing the acts and declarations of the decedent, is the subject of several assignments of error.   We do not think the testimony should have been excluded.   It was not introduced for the purpose of proving the facts stated in the declarations, but that the decedent made declarations or

statements which were inconsistent with the existence and validity of the alleged will, and hence contradictory of the Morgenroth story in regard to that instrument. The statements proved are not declarations by the decedent that he did not execute the alleged will, but were such that if made by him were wholly inconsistent with its existence at the time of his death. The allegation of the defense is that the paper of December 20 came into existence through fraud and forgery and hence the largest latitude in the proof was permissible. The paper itself, having been destroyed by Mrs. Morgenroth, was not produced at the trial and hence there was no opportunity to attack by direct testimony the genuineness of the decedent's signature. It therefore became necessary for those denying the legality of the paper, and in fact the only proof against its validity they could produce was, to show the circumstances, acts and declarations of the interested parties bearing on its validity and genuineness. For this purpose such matters were competent testimony as throwing some light on the question of the fraud and forgery alleged to have been committed in connection with the execution of the instrument. In Gardner's Estate, 164 Pa. 420, Mr. Chief Justice Sterrett, delivering the opinion, says : " The burden having been on the proponents in this case to overcome the presumption of revocation which sprang out of the fact that the will, which Lot Gardner admittedly executed, could not be found at his death, made not only testator's character, condition, acts and declarations, but the conduct and interests of those who were around him, from and after the date of his will, legitimate subjects of inquiry. Each of these lines of proof was important in strengthening the other, and both together seem necessary to constitute full proof." When these parties were here before on the appeal from the judgment sustaining the validity of the will of August 10, 1900 (Gfeller v. Lappe, 208 Pa. 48), Mr. Justice Fell, delivering the opinion of the court, said : " The testimony took a wide range, but necessarily so, since the allegation was that of fraud, and in the issues tried the decedent's acts and declarations, and the conduct of the interested persons around him were legitimate subjects of inquiry." Youndt v. Youndt, 3 Gr. 140, was an issue to determine the validity of a will made in 1850. It

was claimed to have been revoked by a subsequent will made in 1859, but which could not be found and was alleged to have been destroyed by a beneficiary under the earlier will. "This (destruction of the second will), therefore," says Mr. Justice SHARSWOOD, in delivering the opinion, "became the principal fact in dispute before the jury. Thus it became necessary to show that the testator himself did not destroy the will of 1859, and for this purpose his conduct and declarations concerning it, up to near the day of his death, were direct evidence in establishing the negative. And the positive allegations of who did destroy it were very properly made out by the evidence of the acts and declarations of the parties charged with the deed. . . . What became of the second will has become the principal question of the cause, and it is because the declarations objected to help to answer this question, that they are proper evidence." Burkholder v. Plank, 69 Pa. 225, was an action on a bond given by the decedent to his son-in-law, the plaintiff. The defense was that the execution of the bond had been procured by fraud on the obligor. The plaintiff showed that he had rendered services to the decedent and also declarations of kind and grateful feelings of the decedent toward him. The defendant then showed certain facts to sustain the defense of fraud and it was held by this court, reversing the trial court, that he should also have been permitted to give evidence of declarations of the decedent whilst the services were being rendered that he was not well treated and was not friendly with the plaintiff, although not made in plaintiff's presence, as tending to show that the decedent did not intend to make a gift to the plaintiff. Mr. Justice SHARSWOOD, in the opinion of the court, says : "But, regarding it as a question of fraud in the plaintiff in obtaining Burkholder's signature to the note in suit, everything which threw light upon the relation between the parties ought to have been admitted and gone to the jury."

The admission of proof of Lappe's declarations do not conflict with the rule announced in Herster v. Herster, 122 Pa. 239, and Swope v. Donnelly, 190 Pa. 417. In the former case the declarations of the decedent were excluded because they were made several years after the execution of the will and were offered to prove the fact of undue influence but were of

such trivial character as to be wholly insufficient for the purpose. In the opinion it is said : " At the best, however, they (declarations) have little, if any force in establishing fraud or undue influence in the procurement of this will or of the codicils. And especially is this true in view of the fact, that the alleged declarations were not only made after the will was executed, but several years after." The character of the declarations rejected in the Swope case is shown by the following excerpt from the opinion : " The assignments of error are to the admission of declarations of the deceased made to witnesses before the execution of the writing as to the disposition which she intended to make of her property. There was not the slightest limit as to the time when the declarations were made, and under general offers the witnesses were allowed to testify to conversations had at any time during the life of the deceased. This led to the introduction of testimony which was clearly irrelevant."

The remaining assignments raise the question of the adequacy of the charge, and suggest that the case was presented " in the strongest possible light for defendants, without any fair presentation of plaintiffs' proof." But it is the practice, and we have held that the trial judge may in his charge express his opinion and make comments on the testimony, witnesses or parties, provided he leave the jury free to decide the case on the evidence. In cases of this character, consuming much time in the trial, the court may in his charge sometimes inadvertently overlook some parts of the evidence or some questions of law, and hence if counsel apprehend insufficiency in the charge in either respect they should present proper requests for instructions, which will direct the court's attention to the matter. We are not convinced that the learned trial judge in this case committed reversible error in his charge. In submitting the case he said : " While it takes a week to try it, the principles are plain and simple, but the evidence is mighty hard to handle. That is for you and you will have that trouble. . . . You will examine all the evidence, little and big, and I am not going over it. After a week, if I were to go over it, I would probably make mistakes, forget some things, and probably misapprehend others, and might do more harm than good. You have listened to

it, and it is your duty to weigh it, and I know you will do your full duty. You have listened to both sides carefully, without taking part one way or the other, until you get it all before you. . . . Now, do not understand me to suggest any way for you to find. That is for you. . . . If, after weighing the evidence, you are satisfied, notwithstanding all that, that it is honest, clear and satisfactory, then you find for the plaintiff, and we will give you the form."

We think the charge taken as a whole submitted the questions of fact fairly to the determination of the jury. The assignments of error are overruled and the judgment is affirmed.